David EDWARDS, William C. Rich, Michael S. Kelly, ISKCON, Inc., Baltimore Chapter, Appellants,

and

Irvin Collins, Raymond Kissane and Bruce Melzack, Plaintiffs,

v.

MARYLAND STATE FAIR AND AGRICULTURAL SOCIETY, INC.; Howard Mosner, Jr., Manager, Maryland State Fair, Appellees,

and

Cornelius Behan, Chief, Baltimore County Police Department, Defendant.

David EDWARDS, William C. Rich, Michael S. Kelly, ISKCON, Inc., Baltimore Chapter, Appellees,

and

Irvin Collins, Raymond Kissane, and Bruce Melzack, Plaintiffs,

v.

MARYLAND STATE FAIR AND AGRICULTURAL SOCIETY, INC., and Howard Mosner, Jr., Manager, Maryland State Fair, Appellants,

and

Cornelius Behan, Chief, Baltimore County Police Department, Defendant.

Nos. 79-1545, 79-1555.

United States Court of Appeals, Fourth Circuit.

Argued May 6, 1980.

Decided Aug. 12, 1980.

C. Christopher Brown, Baltimore, Md. (Barry A. Fisher, David Grosz, Robert C. Moest, Barry A. Fisher Law Offices, Los Angeles, Cal., on brief), for appellants.

Benson Everett Legg, Baltimore, Md. (J. Frederick Motz, Venable, Baetjer & Howard, Baltimore, Md., on brief), for appellees.

Before WINTER, WIDENER and SPROUSE, Circuit Judges.

WINTER, Circuit Judge:

Plaintiffs, the Baltimore chapter of the International Society for Krishna Consciousness (ISKCON) and three of its members, sought a declaratory judgment that the "booth rule" of the Maryland State Fair unconstitutionally infringes the practice of their religion, and they sought an injunction against its enforcement. While the district court found that the actions of the defendants constituted state action for purposes of the First Amendment, it concluded that neither the "booth rule" nor its enforcement denied plaintiffs their First Amendment rights. Plaintiffs and defendants have both appealed. We agree with the district court with respect to the issue of state action, but we think that the "booth rule" and its enforcement violate plaintiffs' First Amendment rights. We affirm in part and reverse in part and remand for further proceedings.

## I.

Defendants are the Maryland State Fair and Agricultural Society, Inc. and its manager, Howard Mosner, Jr., who pursuant to designation from the Maryland State Fair Board, annually conduct the Maryland State Fair at the fairgrounds in Timonium, Baltimore County, Maryland. Also named as a defendant is Cornelius Behan, Chief of the Baltimore County Police Department, the members of which aid in the enforcement of the rule. Although Maryland State Fair and Agricultural Society, Inc. is a private non-profit corporation, it receives a substantial annual operating and capital funds subsidy from the State of Maryland acting through the Maryland State Fair Board. The Maryland State Fair Board is a creature of statute charged with the duty to "encourage and foster agriculture in the state through promotion and assistance of agricultural fairs, exhibits, or other activities." Maryland appropriates funds to the State Fair Board to be disbursed by it for premium awards, promotional and education activities and "for one state fair each year, as designated by the board." The granting of financial assistance is conditioned upon compliance with the rules and regulations of the Maryland State Fair Board. See Ann.Code of Maryland, Agriculture, §§ 10–301 and 10–303. Other facts concerning the Maryland State Fair are set forth and discussed in the opinion of the district court. We need not repeat them since, as stated below, we affirm the district court in its ruling that the conduct of the fair constitutes state action principally upon the grounds stated in its own opinion.

The individual plaintiffs are members of ISKCON.[1] The practice of their religious beliefs includes the mandatory ritual known as Sankirtan, that is, disseminating religious literature and soliciting funds for the literature to support the missionary programs of ISKCON. Donations and book distribution in exchange for contributions are the principal means of financial support for the ISKCON.

The "booth rule" has been in effect at least since the early 1960's. It requires all persons, organizations and groups, whether commercial, civic, political or religious, wishing to solicit contributions, sell products or distribute literature, to do so from a booth. The rule applies to all persons and organizations regardless of their message. While it does not prohibit members of ISKCON from discussing their beliefs with members of the public anywhere on the fairgrounds, it does restrict them, in the solicitation of contributions and the distribution of literature, to a booth. Plaintiffs have been offered a booth at the same rate as is charged any other organization, and they have been informed that they will be asked leave the fairgrounds or be arrested if they practice Sankirtan on the public areas of the fairgrounds.

The Maryland State Fair operates for a period of ten days beginning in late August of each year. During its ten day run, approximately 445,000 people visit the fair. The attractions include a race track and a race meeting. There are approximately 6,000–7,000 individual exhibitors, 82 commercial exhibitors and 75 concessionaires. At the 1978 Maryland State Fair, six political candidates and one religious group rented booths. The fair has never served as a general forum for political or religious discussion and debate. No candidate for pub-

---

1. The tenets, practices and origins of the Krishna Consciousness religion are fully described in the opinion of the district court; *United States v. Silberman*, 464 F.Supp. 866 (M.D.Fla.1979); *ISKCON v. Griffin*, 437 F.Supp. 666 (W.D.Pa. 1977); *ISKCON v. Conlisk*, 374 F.Supp. 1010 (W.D.Ill.1973); and *ISKCON v. City of New Orleans*, 347 F.Supp. 945 (E.D.La.1972), and need not be repeated here.

The Baltimore chapter of Krishna Consciousness has fifteen priests and approximately 200 lay members. Both priests and lay members can practice Sankirtan. It is stipulated that members of the Baltimore chapter are given the following instructions in Sankirtan:
Practitioners shall:
(a) Identify themselves;
(b) State their purpose;
(c) Explain what the donation is to be used for; for example, to print books to support the Pennsylvania farm, or for education;
(d) Explain that the practice of Krishna Consciousness may impart religious and secular advantages to the worshipper.

lic office and no religious group has been permitted to give a speech at the fair. During the 1978 fair, the "booth rule" was invoked to suppress the distribution of literature by both a political candidate and a "right to life" group.

## II.

Plaintiffs sued under 42 U.S.C. § 1983 which applies sanctions only to states or to private persons or organizations acting under color of state law. Thus, the first issue to be decided in this litigation is whether the defendants in promulgating and enforcing the "booth rule" were acting under color of state law. In agreement with the district court, we think that they were. The Maryland State Fair is an activity of the State of Maryland. Although defendant Maryland State Fair and Agricultural Society, Inc., is a private, non-profit, tax-exempt corporation, it has been designated by Maryland to conduct the Maryland State Fair, and it is granted substantial state funds to enable it to perform this function. In the conduct of the fair, it is regulated by the state as well as substantially subsidized, with aid conditioned upon compliance with state regulations. In our view there is sufficient state involvement in defendants' conduct of the Maryland State Fair to render the First Amendment fully applicable.

Overall, we affirm this ruling of the district court based upon the reasons sufficiently articulated by it as well as the comments above.

## III.

The case comes to us with regard to the exercise of plaintiffs' First Amendment rights, and it seems conceded that Sankirtan is a genuine, necessary ritual in the practice of plaintiffs' religious beliefs. The Krishna Consciousness religion imposes upon its members a duty to approach other individuals directly, to proselytize and to involve members of the public in service to the movement's deity through contribution. It follows from the nature of this ritual that enforcement of the rule may be a complete abrogation of religious expression by ISKCON members. The legal question is whether plaintiffs in the practice of that ritual may be restricted to a booth or whether such a restriction impermissibly burdens the exercise of their First Amendment rights. The district court concluded that the "booth rule" drew a proper accommodation between ISKCON's interest in disseminating its religious views and the state's interest in maintaining proper crowd control at the fair. We think otherwise.

On the record made before the district court, defendants asserted that the purpose of the rule was to promote the orderly administration of the fair and to protect the public. They presented evidence that the rule was entirely reasonable to control the crowds assembled at a large fair or exposition. Before us, crowd control is again asserted as the substantial governmental interest which validates the rule, although defendants also argue that (a) the fairgoers' right to privacy and freedom from interference, (b) the necessity of policing frauds and misrepresentations, (c) the proliferation of solicitations and political speeches which might result if the rule is invalidated, and (d) the ease of enforcement of the existing rule, are considerations which, singly and collectively, validate the restriction. Some of the latter arguments would appear to result from events which have occurred since the district court decided the case.[2]

2. The suit was instituted while the 1978 Maryland State Fair was in progress, and it was finally decided by the district court shortly before the 1979 fair opened. Both parties timely filed a notice of appeal, and plaintiffs sought and were granted an injunction pending appeal subject to certain conditions such as requiring solicitors to wear identification tags, and prohibiting the impeding of traffic, solicitation of funds within ten feet of a booth or exhibit, or solicitation of any person waiting in line. Within several days after it was entered, defendants moved for its dissolution, supporting their motion with 21 police reports and affidavits showing failures to display identification tags, blocking of pedestrian traffic, solicitation of persons standing in line, insolence to persons who did not contribute, snatching of money and pinning of flowers on people without permission, the refusal to make change, and

■ We approach decision in this case under the dual standard articulated in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). To be valid, the "booth rule", which severely inhibits the practice of religion, must be justified by a compelling state interest, and it must be shown that the state aim cannot be accomplished by less restrictive means. Of course, in applying the test, we are fully cognizant that, as defendants point out, the "booth rule" applies only within the Timonium fairgrounds; it does not purport to regulate the practice of Sankirtan in other public places. Nonetheless, we think it invalid. "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State*, 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939). *See also, Spence v. Washington*, 418 U.S. 405, 411 n. 4, 94 S.Ct. 2727, 2731, 41 L.Ed.2d 842 (1974).

■ With respect to crowd control and the state's interest in public safety, we think this case is indistinguishable from *ISKCON v. Bowen*, 600 F.2d 667 (7 Cir.), *cert. denied* 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979). There, as here, the record failed to reflect evidence that either (1) serious disruption would result from permitting Sankirtan at large, or (2) less restrictive regulations would not accomplish the same purpose. "[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). On this record, crowd control and the state's interest in public safety are not shown to compel the rule. Again in agreement with the Seventh Circuit in *Bowen*, we think that the penal laws available to prevent fraud are clearly less restrictive of expression than the "booth rule". *See also Schneider v. New Jersey*, 308 U.S. 147, 164, 60 S.Ct. 146, 152, 84 L.Ed. 155 (1939). As to

the fairgoers' claimed right to privacy and right of freedom from interference, we are even less persuaded. We think that one can hardly go to a state fair with an average daily attendance of approximately 45,000 persons with any reasonable expectation of privacy or any reasonable expectation that one will not be exposed to the voices, the sights and the odors that an exposition of this type generates. Even if fairgoers do not surrender a large part of their right to privacy by attendance at a state fair, it is axiomatic that the First Amendment protects expression which is unpopular as well as that which is annoying and downright irritating. *See Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). More importantly, the state has little right to regulate the exercise of First Amendment rights in a public place, since a person present there is fully capable of refusing any solicitation and continuing on his way.

We reject the notion that this case can properly be decided on the possible horribles with respect to other solicitations and future exercises of free speech which might result from the decision we reach. As has been aptly said, a "fair is almost by definition a congeries of hawkers, vendors of wares and services, and purveyors of ideas, commercial, esthetic and intellectual." *ISKCON v. State Fair*, 461 F.Supp. 719, 721 (N.D.Tex.1978). Tidiness and tranquility are not qualities ordinarily found at fairs, nor are they qualities enshrined in the First Amendment. If others undertake to exercise First Amendment rights at the Maryland State Fair, well and good. The state retains the right to protect substantial state interests by the least restrictive effective regulation, and if the exercise of constitutional rights either by plaintiffs or others who may come upon the scene endanger state interests, defendants are not without authority to act. In short, we decided this case strictly on the record before us, and we decline to speculate as to abuses which may

---

misrepresentations about the purpose of the solicitation of funds. The motion to dissolve was denied on the ground that prosecutions for violation of the criminal laws or citations for

contempt were proper remedies for the claimed infractions, but not dissolution of the injunction and suppression of plaintiffs' First Amendment rights.

occur in the future. What we say here is not necessarily final; indeed, the decree to be entered in consonance with our views may require modification at some future date should a marked change in circumstances be shown.

Finally, we do not think that the ease of administering the "booth rule" and the avoidance of future litigation are considerations which save the rule. The law seems certain that considerations of this sort may not be permitted to invade the proper exercise of a First Amendment right. *See, e. g., Murdock v. Pennsylvania*, 319 U.S. 105, 110–11, 63 S.Ct. 870, 873–74, 87 L.Ed. 1292 (1943); *Schneider v. New Jersey*, 308 U.S. 147, 163, 164, 60 S.Ct. 146, 151, 152, 84 L.Ed. 155 (1939).

In summary, we see no compelling justification for the rule. It must be declared to be violative of plaintiffs' rights under the First Amendment and its enforcement must be enjoined.

*AFFIRMED IN PART; REVERSED IN PART AND REMANDED.*