990 P.2d 683

**In re JULIO L.**

**No. 1 CA–JV 98–0173.**

Court of Appeals of Arizona, Division 1, Department E.

Aug. 19, 1999.

Review Granted Jan. 4, 2000.

Richard M. Romley, Maricopa County Attorney by Patricia A. Nigro, Deputy County Attorney, Phoenix, Attorneys for Appellee.

Dean W. Trebesch, Maricopa County Public Defender by Joel M. Glynn, Deputy Public Defender, Phoenix, Attorneys for Appellant.

OPINION

THOMPSON, Presiding Judge.

¶ 1 Julio L. (juvenile) appeals from an adjudication of delinquency for disorderly con-

duct pursuant to Ariz.Rev.Stat. Ann. (A.R.S.) § 13–2904. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Juvenile is a student at Escuela Azteca, an alternative middle school for students who are not successful in a regular middle school setting. Sandra Ferrero (Ferrero) is the director-principal of the school.

¶ 3 On December 5, 1997, Ferrero entered juvenile's classroom at about 8:30 a.m. The students at Escuela Azteca are required to wear uniforms, however, juvenile was not wearing his uniform. When Ferrero asked him why he was not in uniform, he explained that it wasn't clean. Ferrero testified that juvenile "was just having a bad morning all around." During the morning session class, juvenile was talking to other students, laughing, and giggling while the teachers gave their overview of the day's events.

¶ 4 Ferrero decided to confront juvenile during "transition time," which is the time period between the morning session and the homeroom session. As juvenile was walking to his homeroom class, Ferrero asked juvenile twice if he would talk with her outside the classroom. He ignored her both times, entered the classroom, and sat down. She asked him a third time to leave the classroom and talk to her. Juvenile looked directly at Ferrero, said "fuck you," and kicked the chair next to him. The chair tipped over, but did not strike anyone. Although she had experience dealing with problematic students, Ferrero testified that she was offended by juvenile's language and conduct. Ferrero told him that his behavior warranted an officer referral and ordered him to leave the classroom. Juvenile, "talking and arguing under his breath," followed her to the office.

¶ 5 The state filed a petition against juvenile, alleging disorderly conduct pursuant to A.R.S. § 13–2904. An adjudication hearing was held on April 21, 1998. The juvenile court adjudicated juvenile delinquent, finding that his "conduct constituted seriously disruptive behavior." *See* A.R.S. § 13–2904(A)(1). Juvenile timely appealed. This court has jurisdiction pursuant to A.R.S. § 12–120.21(A)(1) and A.R.S. § 8–236(A).

## DISCUSSION

¶ 6 Juvenile argues that there is insufficient evidence to support the juvenile court's holding. We will not reweigh the evidence in determining its sufficiency. Rather, we must view the evidence in the light most favorable to sustaining the verdict, resolving all reasonable inferences in favor of the state. *See State v. Sanders,* 118 Ariz. 192, 196, 575 P.2d 822, 826 (App.1978) (citing *State v. Gaines,* 113 Ariz. 206, 549 P.2d 574 (1976)). Only when there is a complete absence of probative facts to support a judgment, or when a judgment is clearly contrary to any substantial evidence may we reverse on the grounds of insufficient evidence. *See id.*

### A. Seriously Disruptive Behavior

¶ 7 Section 13–2904(A)(1) states that

A. A person commits disorderly conduct if, with intent to disturb the peace or quiet of a neighborhood, family or person, or with knowledge of doing so, such person:

1. Engages in fighting, violent or seriously disruptive behavior[.]

¶ 8 Juvenile argues that his conduct did not constitute "seriously disruptive behavior" within the meaning of the statute. The record indicates that juvenile's behavior worsened over the course of the morning. Initially, juvenile was not dressed in the mandatory uniform, and he was talking during class. He then ignored two requests from Ferrero to speak with her outside the classroom. After cursing at Ferrero, he angrily kicked over a chair and argued with her. The evidence reflects that at least several students and a teacher were present during juvenile's misbehavior. Ferrero testified that she was concerned about how the class might react to juvenile's conduct. She insisted that she "couldn't let him back into the classroom after he said fuck you. I couldn't do that." Finally, Ferrero testified that, although juvenile did not appear to be

provoking her into a fight, she was offended after juvenile cursed and kicked the chair.[1]

¶ 9 Juvenile insists that he has not breached the statute, because there is no evidence that the other students and teacher were actually offended by his conduct. However, our supreme court has held that evidence of actual disturbance is not required. *See State v. Johnson*, 112 Ariz. 383, 385, 542 P.2d 808, 810 (1975).[2] Instead, the statute merely requires that juvenile acted *"with intent* to disturb the peace. . . ." A.R.S. § 13–2904(A) (Supp.1998) (emphasis added).[3]

¶ 10 Arizona courts have not interpreted the application of "seriously disruptive behavior" within a school setting. Other jurisdictions have done so. In *In re D.A.D.*, 224 Ga.App. 527, 481 S.E.2d 262, 263–64 (1997), a juvenile was charged with disorderly conduct. There, while most of the juvenile's class was playing touch football, the juvenile could not play because he did not "dress out" in shorts and a t-shirt. *See id.* When a class of special education students walked by, the juvenile called one of the students "retarded." *See id.* at 264. The juvenile ignored his teacher's instructions to stop talking. *See id.* When the teacher told him to "shut up before I hit you in the mouth," the juvenile slapped the teacher's hand and said, "get your fucking hands out of my face." *Id.* The juvenile shouted some more obscenities, and he was subsequently charged with disorderly conduct. *See id.* Similar to A.R.S. § 13–2904, the statute in *D.A.D.* prohibited "engag[ing] in any violent, tumultuous, obstreperous, or similar disorderly conduct *tending to infringe on the peace and repose of the citizens of the City."* *Id.* (emphasis

added). The court found sufficient evidence to affirm the juvenile's conviction. *See id.* Specifically, the court held that the juvenile's conduct "would tend to infringe on the relative peace of the other students individually and disrupt the class generally." *Id.* The court did not consider whether juvenile *actually* disrupted his classmates. *See id.*

¶ 11 In *City of Chicago v. Mateja*, 57 Ill. App.3d 144, 14 Ill.Dec. 781, 372 N.E.2d 1060, 1062 (1978), the court reversed a juvenile's conviction for disorderly conduct. There, the juvenile threw a "sign-out" card onto his teacher's desk, and demanded that she sign it for him. *See id.* 14 Ill.Dec. 781, 372 N.E.2d at 1061. After she signed it, he grabbed the card and said, "Mrs. Morris, you're an asshole." *Id.* The juvenile then stood in the doorway and cursed at the teacher until a security officer arrived and removed him from the classroom. *See id.* Unlike the statute in our case, the applicable statute in *Mateja* provided that "[a] person commits disorderly conduct when he knowingly . . . [d]oes any act in such unreasonable manner as to provoke, make or aid in making a breach of peace." *Id.* The court reversed the juvenile's conviction because "there was no showing that his behavior led to any disturbance or disorder." *Id.* 14 Ill.Dec. 781, 372 N.E.2d at 1062. Section 13–2904(A)(1) requires no such showing. *See State v. Johnson*, 112 Ariz. at 385, 542 P.2d at 810 (not necessary that state prove any particular person was disturbed by defendant's conduct).

¶ 12 We conclude that there is sufficient evidence of "seriously disruptive behavior" to

---

1. Juvenile maintains that Ferrero "had to anticipate hearing such language, because her school was designed to teach students who had behavioral problems." Other jurisdictions have found this argument unpersuasive. *See In re Nahif A.*, 123 Md.App. 193, 717 A.2d 393, 400 (1998) (prohibition against disorderly conduct in school does not exclude students with behavior problems).

2. The dissent asserts that the present case is distinguishable from *Johnson* because juvenile here was charged with disturbing the peace of a particular person. Aside from the fact that the current version of our disorderly conduct statute requires only an intent to disturb, juvenile was

properly convicted for conduct that violates the statute. The specification in the charge of one way of committing an offense does not preclude proof that the offense was committed another way. *See* Rule 13.5, Ariz. R.Crim. P. (charge is deemed amended to conform to the evidence); *State v. Stough*, 137 Ariz. 121, 123, 669 P.2d 99, 101 (App.1983) (although charged with committing crime in one way, defendant properly convicted on evidence he committed charged offense in another manner).

3. We further note that the term "disruptive" is defined as "causing, tending to cause, or caused by disruption; disrupting." *Random House Dictionary of the English Language* 569 (2d ed.1987).

affirm juvenile's conviction for disorderly conduct.

## B. First Amendment Considerations

■ ¶ 13 Juvenile argues that, under these facts, the application of A.R.S. § 13–2904(A)(1) violates his First Amendment right to free speech. It is well-established, however, that an individual's right to free speech is not absolute. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Moreover, the United States Supreme Court has consistently rejected "the view that an apparently limitless variety of conduct can be labeled 'speech'...." *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

■ ¶ 14 Conduct must be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments...." *Spence v. Washington*, 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). The Constitution protects a wide variety of conduct. *See id.* at 406–08, 94 S.Ct. 2727 (United States flag with peace symbol taped to it displayed upside down out of apartment window in protest against invasion of Cambodia and killings at Kent State University); *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 504, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (school children wearing black armbands to protest American involvement in Vietnam); *Brown v. Louisiana*, 383 U.S. 131, 135–37, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (blacks conducting a sit-in in a "whites only" library reading room to protest segregation). In the present case, juvenile's conduct does not merit the First Amendment protection granted in the preceding cases, because his intentional misbehavior is not similarly "imbued with elements of communication." *Spence*, 418 U.S. at 409, 94 S.Ct. 2727. The Constitution does not shield juvenile's arbitrary decision to disobey school authorities.

¶ 15 It is probative that juvenile's actions occurred while he was in school. For example, in *M.C. v. State*, 695 So.2d 477, 480–84 (Fla.Dist.Ct.App.1997), the court affirmed a juvenile's conviction for disorderly conduct in school. The court distinguished a similar case, *L.A.T. v. State*, 650 So.2d 214 (Fla.Dist. Ct.App.1995), where the court reversed a juvenile's conviction for disorderly conduct in a shopping center parking lot. The court in *M.C.* explained that the school environment was more restrictive than other public settings, stating that, "[w]hile L.A.T.'s loud verbal protests ... may be constitutionally protected in the setting of an open public shopping center parking lot, those same protests may not enjoy such constitutional protection in other settings." 695 So.2d at 480.

■ ¶ 16 The United States Supreme Court has noted that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506, 89 S.Ct. 733. However, "the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* at 507, 89 S.Ct. 733.[4] The environment of juvenile's conduct cannot be ignored. Indeed, "[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). In the present case, juvenile's intentional misconduct is clearly incompatible with the function and purpose of the school. We find no constitutional infirmity in his conviction for disorderly conduct.

## CONCLUSION

¶ 17 For all the foregoing reasons, we affirm the holding of the trial court.

CONCURRING: JEFFERSON L. LANKFORD, Judge.

---

4. In *Tinker,* the Court reversed the suspensions of three students who wore black armbands in protest of the Vietnam war. *See* 393 U.S. at 514, 89 S.Ct. 733. The Court likened the wearing of armbands to "pure speech," and insisted that a prohibition on speech cannot be sustained unless it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others...." *Id.* at 509, 513, 89 S.Ct. 733. Here, juvenile's disruptive conduct illustrates that he was not engaging in the type of expressive conduct contemplated in *Tinker*.

NOYES, Judge, dissenting.

¶18 The facts in this case were provided by Ms. Ferrero, the school principal—and named victim. Her testimony is at the end of this opinion, so readers can draw their own conclusions about the facts.[1] The one

1. Q. [To the victim by the Prosecutor] Do you recall how many students were in the classroom that day?

A. I don't know exactly the exact count because we were in a transition period going from morning session into the first hour.

. . . .

Q. You asked Julio—did you ask Julio why he was not in uniform [i.e., not wearing blue pants]?

A. Yes.

Q. And did he give you any explanation as to why he was not in his uniform?

A. He said it wasn't clean.

Q. Did you ask him to leave the classroom?

A. I asked—he—it was an ongoing thing. It started opening session. He was talking when the teachers were giving their overview of what was happening. During the class you have to get proper attention. You have to raise your hand to get a G.T.A. Getting a teacher's attention appropriately.

Julio was just having a bad morning all around. And I asked him several times to come out because I needed to do an interaction with him.

Q. Did he come out of the classroom?

A. After I asked him several times, yes, he did. But before he did—

Q. What did he do when you asked him to come out of the classroom? Did he do something specific?

A. First I asked him while in the process of moving from one classroom to another, I asked him to come out, he just kept walking. And I said, come on, Julio, we have to do interaction. He said, no. He went to go sit down.

Q. Did you ask him to come out again?

A. Yes, I did.

Q. What did he say then?

A. He said no.

Q. Did you ask him a third time to come out of the classroom?

A. Yes.

Q. What did he say?

A. He said fuck you and he kicked the chair next to him.

Q. Then he got up?

A. Then he kicked over the chair and came out.

Q. Were there other students in the classroom at that time?

A. Yes, there were.

Q. Do you recall how many?

A. I would say three or four.

Q. How loudly did he say fuck you?

A. I heard it and he was sitting where Officer Maya is and where I was. I was standing where sitting right here.

Q. What tone of voice did he use?

A. He was angry and he said fuck you and he kicked the chair.

Q. How did you react to that?

A. I said that's an officer referral, come on, let's go.

. . . .

Q. And did he walk quietly to the office?

A. He didn't yell down the hallway, no, but he was still talking under his breath.

Q. Did you notice if any of the other students in the classroom appeared to have heard Julio?

A. I wasn't focusing on anyone else in the classroom. I had all my attention on Julio because I wanted to remove him as quickly as possible from the class.

Q. Okay. Okay. What kind of chair did he kick over?

A. It was a plastic chair, approximately—we call them middle school chairs. It was plastic, hard chair with four legs.

. . . .

Q. [By Defense Counsel] So in other words there was no profanity after the fuck you, is that correct?

A. No, sir.

Q. And the fuck you was not shouted, was it?

A. No.

. . . .

Q. Now, when he kicked the chair, you told me yesterday, you don't know whether it actually tipped over?

A. It was tipped.

Q. But it moved about a yard you said?

A. Ah-hum.

Q. It didn't strike anybody at that time?

A. No, at that time.

Q. The juvenile squared off like he was going to fight you?

A. No.

Q. He did not physically provoke you, like you had to fight him, is that correct?

A. No.

Q. And he didn't say anything to you indicating that he wanted to fight you, is that accurate?

A. No. I mean, no, he did not.

Q. When did you—you told me and correct me if I am wrong—at that point you didn't think to suspend him, not after the fact, but when he kept arguing about going to the office and you said, if you keep arguing back, it was going to be suspension, and he said, go ahead, is that correct?

A. Ah-hum.

Q. Is that right?

A. It was going—yeah, I couldn't let him back into the classroom after he said fuck you. I couldn't do that.

Q. Initially you were just going to bring him to the office and do some kind of disciplinary action, but when he kept arguing what was going to happen, you said, if you keep arguing back, it will be suspension and then he said, go ahead, is that accurate?

A. Ah-hum.

other witness was a police officer, whose only material testimony was as follows: "[Juvenile] told me that he had kicked a chair or pushed it with his foot. He told me that he did not tell Ms. Ferrero fuck you."

¶ 19 The weakness of the facts in this case—in relation to the elements of the disorderly conduct statute—is highlighted by the following passage from the State's rebuttal argument:

> The juvenile was removed from the classroom because of what he said and because [of] what he did. And I'm asking the Court to find because of those actions and because of what the juvenile did, he was disruptive. And he was disruptive to the extent that he had to be removed from the classroom. We would ask the Court find him guilty of the charge.

¶ 20 I agree that the juvenile was disruptive to the extent that he had to be removed from the classroom (when class was not in session). But this is not a school discipline case; it is a criminal case. To convict on the facts in this case, I respectfully suggest, is to remove "seriously" from the disorderly conduct statute's element of "seriously disruptive behavior."

¶ 21 The majority cites *State v. Johnson*, 112 Ariz. 383, 542 P.2d 808 (1975), for the proposition that "evidence of actual disturbance is not required," as if to suggest that one can be convicted of disorderly conduct without creating a disturbance. *Johnson* has no application in this case. The *Johnson* defendant was charged with disturbing the peace of a neighborhood, and the court rejected his argument that the State had to prove that he disturbed the peace of some specific person in the neighborhood. *Id.* at 385, 542 P.2d at 810. In the present case, however, the juvenile *was* in fact charged with disturbing the peace of a specific person, "to wit: Sandra Ferrero, by engaging in fighting, violent or seriously disruptive behavior."

¶ 22 The juvenile focused much argument on freedom of speech issues. I agree that his profanity was not criminal, but I will not argue the point because the court made clear that it did not convict the juvenile for profanity. When denying the juvenile's motion for reconsideration, the court stated as follows:

> [Defense counsel], for the record, your motion indicates that the decision was based on the child's use of profanity. The decision was based primarily on the disruption caused by kicking of the chair in the classroom. I did read your information on use of profanity and that was not a significant matter.

¶ 23 With or without the child's use of profanity, his kicking this chair in the classroom (when class was not in session) was not seriously disruptive behavior. This conviction should be reversed for insufficient evidence.

. . . .

Q. So you told me about when he said fuck you, and that is all part of this depersonalizing thing as an administrative professional, you know enough not to let it get to you, is that correct?

A. Talking about personally or administratively?

Q. Administratively?

A. Administratively. I am offended administratively.

Q. But not personally?

A. Personally because of the training, no. I don't internalize it. I go on with it. But administratively I need to deal with it.

Q. And that is what you did, is that correct, you dealt with it administratively by suspending him, is that correct?

A. Yes.

. . . .

Q. So, to clarify, when he said this to you, you didn't feel frightened, you didn't feel physically provoked in any way, is that correct?

A. Honestly, physically I did feel offended, but I've got to maintain my composure all of the time.

Q. You didn't feel physically like he was provoking you to come and beat him up, or fight him, is that correct?

A. No, he was being defiant.