## SPENCE v. WASHINGTON

No. 72-1690.   Argued January 9, 1974—Decided June 25, 1974

*Peter Greenfield* argued the cause for appellant.   With him on the briefs were *Burt Neuborne, Melvin L. Wulf,* and *Joel M. Gora.*

*James E. Warme* argued the cause for appellee.   With him on the brief was *Christopher T. Bayley.*

PER CURIAM.

Appellant displayed a United States flag, which he owned, out of the window of his apartment.   Affixed to both surfaces of the flag was a large peace symbol fashioned of removable tape.   Appellant was convicted under a Washington statute forbidding the exhibition of a United States flag to which is attached or super-imposed figures, symbols, or other extraneous material.   The Supreme Court of Washington affirmed appellant's

conviction. 81 Wash. 2d 788, 506 P. 2d 293 (1973). It rejected appellant's contentions that the statute under which he was charged, on its face and as applied, contravened the First Amendment, as incorporated by the Fourteenth Amendment, and was void for vagueness. We noted probable jurisdiction. 414 U. S. 815 (1973). We reverse on the ground that as applied to appellant's activity the Washington statute impermissibly infringed protected expression.

## I

On May 10, 1970, appellant, a college student, hung his United States flag from the window of his apartment on private property in Seattle, Washington. The flag was upside down, and attached to the front and back was a peace symbol (*i. e.,* a circle enclosing a trident) made of removable black tape. The window was above the ground floor. The flag measured approximately three by five feet and was plainly visible to passersby. The peace symbol occupied roughly half of the surface of the flag.

Three Seattle police officers observed the flag and entered the apartment house. They were met at the main door by appellant, who said: "I suppose you are here about the flag. I didn't know there was anything wrong with it. I will take it down." Appellant permitted the officers to enter his apartment, where they seized the flag and arrested him. Appellant cooperated with the officers. There was no disruption or altercation.

Appellant was not charged under Washington's flag-desecration statute. See Wash. Rev. Code § 9.86.030, as amended.[1] Rather, the State relied on the so-called

---

[1] This statute provides in part:

"No person shall knowingly cast contempt upon any flag, standard, color, ensign or shield . . . by publicly mutilating, defacing, defiling,

"improper use" statute, Wash. Rev. Code § 9.86.020. This statute provides, in pertinent part:

"No person shall, in any manner, for exhibition or display:

"(1) Place or cause to be placed any word, figure, mark, picture, design, drawing or advertisement of any nature upon any flag, standard, color, ensign or shield of the United States or of this state . . . or

"(2) Expose to public view any such flag, standard, color, ensign or shield upon which shall have been printed, painted or otherwise produced, or to which shall have been attached, appended, affixed or annexed any such word, figure, mark, picture, design, drawing or advertisement . . . ." [2]

Appellant initially was tried to the bench in a local justice court, where he was found guilty and sentenced to 90 days' confinement, with 60 days suspended. Appellant exercised his right to be tried *de novo* in King County Superior Court, where he received a jury trial.

The State based its case on the flag itself and the testimony of the three arresting officers, who testified that they had observed the flag displayed from appellant's window and that on the flag was superimposed what they identified as a peace symbol. Appellant took

---

burning, or trampling upon said flag, standard, color, ensign or shield."

[2] Washington Rev. Code § 9.86.010 defines the flags and other symbols protected by the desecration and improper-use statutes as follows:

"The words flag, standard, color, ensign or shield, as used in this chapter, shall include any flag, standard, color, ensign or shield, or copy, picture or representation thereof, made of any substance or represented or produced thereon, and of any size, evidently purporting to be such flag, standard, color, ensign or shield of the United States or of this state, or a copy, picture or representation thereof."

the stand in his own defense. He testified that he put a peace symbol on the flag and displayed it to public view as a protest against the invasion of Cambodia and the killings at Kent State University, events which occurred a few days prior to his arrest. He said that his purpose was to associate the American flag with peace instead of war and violence:

"I felt there had been so much killing and that this was not what America stood for. I felt that the flag stood for America and I wanted people to know that I thought America stood for peace."

Appellant further testified that he chose to fashion the peace symbol from tape so that it could be removed without damaging the flag. The State made no effort to controvert any of appellant's testimony.

The trial court instructed the jury in essence that the mere act of displaying the flag with the peace symbol attached, if proved beyond a reasonable doubt, was sufficient to convict. There was no requirement of specific intent to do anything more than display the flag in that manner. The jury returned a verdict of guilty. The court sentenced appellant to 10 days in jail, suspended, and to a $75 fine. The Washington Court of Appeals reversed the conviction. 5 Wash. App. 752, 490 P. 2d 1321 (1971). It held the improper-use statute overbroad and invalid on its face under the First and Fourteenth Amendments. With one justice dissenting and two concurring in the result, the Washington Supreme Court reversed and reinstated the conviction. 81 Wash. 2d 788, 506 P. 2d 293 (1973).

## II

A number of factors are important in the instant case. First, this was a privately owned flag. In a technical property sense it was not the property of any govern-

ment. We have no doubt that the State or National Governments constitutionally may forbid anyone from mishandling in any manner a flag that is public property. But this is a different case. Second, appellant displayed his flag on private property. He engaged in no trespass or disorderly conduct. Nor is this a case that might be analyzed in terms of reasonable time, place, or manner restraints on access to a public area. Third, the record is devoid of proof of any risk of breach of the peace. It was not appellant's purpose to incite violence or even stimulate a public demonstration. There is no evidence that any crowd gathered or that appellant made any effort to attract attention beyond hanging the flag out of his own window. Indeed, on the facts stipulated by the parties there is no evidence that anyone other than the three police officers observed the flag.

Fourth, the State concedes, as did the Washington Supreme Court, that appellant engaged in a form of communication.[3] Although the stipulated facts fail to show that any member of the general public viewed the flag, the State's concession is inevitable on this record. The undisputed facts are that appellant "wanted people to know that I thought America stood for peace." To be sure, appellant did not choose to articulate his views through printed or spoken words. It is therefore necessary to determine whether his activity was sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments, for as the Court noted in *United States* v. *O'Brien*, 391 U. S. 367, 376 (1968), "[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." But the nature of

---

[3] Brief for Appellee 3; 81 Wash. 2d, at 799, 800, 506 P. 2d, at 300, 301.

appellant's activity, combined with the factual context and environment in which it was undertaken, lead to the conclusion that he engaged in a form of protected expression.

The Court for decades has recognized the communicative connotations of the use of flags. *E. g., Stromberg* v. *California,* 283 U. S. 359 (1931). In many of their uses flags are a form of symbolism comprising a "primitive but effective way of communicating ideas . . . ," and "a short cut from mind to mind." *Board of Education* v. *Barnette,* 319 U. S. 624, 632 (1943). On this record there can be little doubt that appellant communicated through the use of symbols. The symbolism included not only the flag but also the superimposed peace symbol.

Moreover, the context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol. See *Tinker* v. *Des Moines School District,* 393 U. S. 503 (1969). In *Tinker,* the wearing of black armbands in a school environment conveyed an unmistakable message about a contemporaneous issue of intense public concern—the Vietnam hostilities. *Id.,* at 505–514. In this case, appellant's activity was roughly simultaneous with and concededly triggered by the Cambodian incursion and the Kent State tragedy, also issues of great public moment. Cf. *Scheuer* v. *Rhodes,* 416 U. S. 232 (1974). A flag bearing a peace symbol and displayed upside down by a student today might be interpreted as nothing more than bizarre behavior, but it would have been difficult for the great majority of citizens to miss the drift of appellant's point at the time that he made it.

It may be noted, further, that this was not an act of mindless nihilism. Rather, it was a pointed expression of anguish by appellant about the then-current domestic and foreign affairs of his government. An intent to

convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.

We are confronted then with a case of prosecution for the expression of an idea through activity. Moreover, the activity occurred on private property, rather than in an environment over which the State by necessity must have certain supervisory powers unrelated to expression. Cf. *Procunier* v. *Martinez,* 416 U. S. 396 (1974); *Healy* v. *James,* 408 U. S. 169 (1972); *Tinker* v. *Des Moines School District, supra.* Accordingly, we must examine with particular care the interests advanced by appellee to support its prosecution.

We are met at the outset with something of an enigma in the manner in which the case was presented to us. The Washington Supreme Court rejected any reliance on a breach-of-the-peace rationale. 81 Wash. 2d, at 796 n. 1, 506 P. 2d, at 299 n. 1. It based its result primarily on the ground that "the nation and state both have a recognizable interest in preserving the flag as a symbol of the nation . . . ." [4] Yet counsel for the State declined to support the highest state court's principal rationale in argument before us. [5] He pursued instead the breach-of-the-peace theory discarded by the state court. Indeed, that was the only basis on which he chose to support the constitutionality of the state statute.

---

[4] 81 Wash. 2d, at 799, 506 P. 2d, at 300. A subsidiary ground relied on by the Washington Supreme Court must be rejected summarily. It found the inhibition on appellant's freedom of expression "minuscule and trifling" because there are "thousands of other means available to [him] for the dissemination of his personal views . . . ." *Id.,* at 799, 800, 506 P. 2d, at 300, 301. As the Court noted in, *e. g., Schneider* v. *State,* 308 U. S. 147, 163 (1939), "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."

[5] Brief for Appellee 6; Tr. of Oral Arg. 31–32.

Despite counsel's approach, we think it appropriate to review briefly the range of various state interests that might be thought to support the challenged conviction, drawing upon the arguments before us, the opinions below, and the Court's opinion in *Street* v. *New York*, 394 U. S. 576, 590–594 (1969). The first interest at issue is prevention of breach of the peace. In our view, the Washington Supreme Court correctly rejected this notion. It is totally without support in the record.

We are also unable to affirm the judgment below on the ground that the State may have desired to protect the sensibilities of passersby. "It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street* v. *New York, supra,* at 592. Moreover, appellant did not impose his ideas upon a captive audience. Anyone who might have been offended could easily have avoided the display. See *Cohen* v. *California,* 403 U. S. 15 (1971). Nor may appellant be punished for failing to show proper respect for our national emblem. *Street* v. *New York, supra,* at 593; *Board of Education* v. *Barnette, supra.*[6]

We are brought, then, to the state court's thesis that Washington has an interest in preserving the national flag as an unalloyed symbol of our country. The court did not define this interest; it simply asserted it. See 81 Wash. 2d, at 799, 506 P. 2d, at 300. MR. JUSTICE REHNQUIST's dissenting opinion today, see *post,* at 420–422, adopts essentially the same approach. Presumably, this interest might be seen as an effort to prevent the appropriation of a revered national symbol by an individual, interest group, or enterprise where there was a risk that association of the symbol with a particular

---

[6] Counsel for the State conceded that promoting respect for the flag is not a legitimate state interest. Tr. of Oral Arg. 30.

product or viewpoint might be taken erroneously as evidence of governmental endorsement.[7] Alternatively, it might be argued that the interest asserted by the state court is based on the uniquely universal character of the national flag as a symbol. For the great majority of us, the flag is a symbol of patriotism, of pride in the history of our country, and of the service, sacrifice, and valor of the millions of Americans who in peace and war have joined together to build and to defend a Nation in which self-government and personal liberty endure. It evidences both the unity and diversity which are America. For others the flag carries in varying degrees a different message. "A person gets' from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn." *Board of Education* v. *Barnette*, 319 U. S., at 632–633. It might be said that we all draw something from our national symbol, for it is capable of conveying simultaneously a spectrum of meanings. If it may be destroyed or permanently disfigured, it could be argued that it will lose its capability of mirroring the sentiments of all who view it.

But we need not decide in this case whether the interest

---

[7] Undoubtedly such a concern underlies that portion of the improper-use statute forbidding the utilization of representations of the flag in a commercial context. Indeed, the third subparagraph of the improper-use statute, Wash. Rev. Code § 9.86.020 (3), which is not at issue here, is aimed directly at commercial exploitation of our national symbol. There is no occasion in this case to address the application of the challenged statute to commercial behavior. Cf. *Halter* v. *Nebraska*, 205 U. S. 34 (1907). MR. JUSTICE REHNQUIST's dissent places major reliance on *Halter*, see *post*, at 418–420, despite the fact that *Halter* was decided nearly 20 years before the Court concluded that the First Amendment applies to the States by virtue of the Fourteenth Amendment. See *Gitlow* v. *New York*, 268 U. S. 652 (1925).

advanced by the court below is valid.[8]  We assume,
*arguendo,* that it is.  The statute is nonetheless uncon-
stitutional as applied to appellant's activity.[9]  There
was no risk that appellant's acts would mislead viewers
into assuming that the Government endorsed his view-
point.  To the contrary, he was plainly and peacefully [10]

---

[8] If this interest is valid, we note that it is directly related to
expression in the context of activity like that undertaken by appel-
lant.  For that reason and because no other governmental interest
unrelated to expression has been advanced or can be supported on
this record, the four-step analysis of *United States* v. *O'Brien,* 391
U. S. 367, 377 (1968), is inapplicable.

[9] Because we agree with appellant's as-applied argument, we do
not reach the more comprehensive overbreadth contention he also
advances.  But it is worth noting the nearly limitless sweep of the
Washington improper-use flag statute.  Read literally, it forbids
a veteran's group from attaching, *e. g.,* battalion commendations to
a United States flag.  It proscribes photographs of war heroes
standing in front of the flag.  It outlaws newspaper mastheads com-
posed of the national flag with superimposed print.  Other examples
could easily be listed.

Statutes of such sweep suggest problems of selective enforcement.
We are, however, unable to agree with appellant's void-for-vagueness
argument.  The statute's application is quite mechanical, particu-
larly when implemented with jury instructions like the ones given
in this case.  The law in Washington, simply put, is that *nothing*
may be affixed to or superimposed on a United States flag or a
representation thereof.  Thus, if selective enforcement has occurred,
it has been a result of prosecutorial discretion, not the language of
the statute.  Accordingly, this case is unlike *Smith* v. *Goguen,* 415
U. S. 566 (1974), where the words of the statute at issue ("pub-
licly . . . treats contemptuously") were themselves sufficiently in-
definite to prompt subjective treatment by prosecutorial authorities.

[10] Appellant's activity occurred at a time of national turmoil over
the introduction of United States forces into Cambodia and the
deaths at Kent State University.  It is difficult now, more than
four years later, to recall vividly the depth of emotion that per-
vaded most colleges and universities at the time, and that was
widely shared by young Americans everywhere.  A spontaneous out-
pouring of feeling resulted in widespread action, not all of it rational

protesting the fact that it did not. Appellant was not charged under the desecration statute, see n. 1, *supra,* nor did he permanently disfigure the flag or destroy it. He displayed it as a flag of his country in a way closely analogous to the manner in which flags have always been used to convey ideas. Moreover, his message was direct, likely to be understood, and within the contours of the First Amendment. Given the protected character of his expression and in light of the fact that no interest the State may have in preserving the physical integrity of a privately owned flag was significantly impaired on these facts, the conviction must be invalidated.[11]

The judgment is reversed.

*It is so ordered.*

MR. JUSTICE BLACKMUN concurs in the result.

MR. JUSTICE DOUGLAS, concurring.

I would reverse the judgment for substantially the same reasons given by the Iowa Supreme Court in *State v. Kool,* 212 N. W. 2d 518. In that case the de-

---

when viewed in retrospect. This included the closing down of some schools, as well as other disruptions of many centers of education. It was against this highly inflamed background that appellant chose to express his own views in a manner that can fairly be described as gentle and restrained as compared to the actions undertaken by a number of his peers.

[11] The similarity of our holding to that of the Iowa Supreme Court in *State v. Kool,* 212 N. W. 2d 518 (1973), merits note. In that case, the defendant displayed a replica of the United States flag upside down in his window, superimposing a peace symbol to create an effect identical to that achieved by Spence. Recognizing the communicative character of the defendant's activity, the Iowa Supreme Court reversed his conviction for flag misuse and held the statute unconstitutional as applied. The court eschewed an overbreadth analysis, and it rejected a number of the state interests we have found unavailing in the instant case.

fendant hung a peace symbol made of cardboard and wrapped in tinfoil in the window of his home and hung a replica of the United States flag behind the peace symbol but in an upside-down position. The state statute made it a crime to "cast contempt upon, satirize, deride or burlesque [the] flag," Iowa Code § 32.1.

The court held that defendant's conduct constituted "symbolic speech." The court, in reversing the conviction, said:

> "Someone in Newton might be so intemperate as to disrupt the peace because of this display. But if absolute assurance of tranquility is required, we may as well forget about free speech. Under such a requirement, the only 'free' speech would consist of platitudes. That kind of speech does not need constitutional protection." 212 N. W. 2d, at 521.

That view is precisely my own. Hence I concur in reversing this judgment of conviction.

MR. CHIEF JUSTICE BURGER, dissenting.

If the constitutional role of this Court were to strike down unwise laws or restrict unwise application of some laws, I could agree with the result reached by the Court. That is not our function, however, and it should be left to each State and ultimately the common sense of its people to decide how the flag, as a symbol of national unity, should be protected.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and MR. JUSTICE WHITE join, dissenting.

The Court holds that a Washington statute prohibiting persons from attaching material to the American flag was unconstitutionally applied to appellant. Although I agree with the Court that appellant's activity was a form of communication, I do not agree that the First

Amendment prohibits the State from restricting this activity in furtherance of other important interests. And I believe the rationale by which the Court reaches its conclusion is unsound.

"[T]he right of free speech is not absolute at all times and under all circumstances." *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571 (1942). This Court has long recognized, for example, that some forms of expression are not entitled to any protection at all under the First Amendment, despite the fact that they could reasonably be thought protected under its literal language. See *Roth* v. *United States,* 354 U. S. 476 (1957). The Court has further recognized that even protected speech may be subject to reasonable limitation when important countervailing interests are involved. Citizens are not completely free to commit perjury, to libel other citizens, to infringe copyrights, to incite riots, or to interfere unduly with passage through a public thoroughfare. The right of free speech, though precious, remains subject to reasonable accommodation to other valued interests.

Since a State concededly may impose some limitations on speech directly, it would seem to follow *a fortiori* that a State may legislate to protect important state interests even though an incidental limitation on free speech results. Virtually any law enacted by a State, when viewed with sufficient ingenuity, could be thought to interfere with some citizen's preferred means of expression. But no one would argue, I presume, that a State could not prevent the painting of public buildings simply because a particular class of protesters believed their message would best be conveyed through that medium. Had appellant here chosen to tape his peace symbol to a federal courthouse, I have little doubt that he could be prosecuted under a statute properly drawn to protect public property.

Yet the Court today holds that the State of Washington cannot limit use of the American flag, at least insofar as its statute prevents appellant from using a privately owned flag to convey his personal message. Expressing its willingness to assume, *arguendo*, that Washington has a valid interest in preserving the integrity of the flag, the Court nevertheless finds that interest to be insufficient in this case. To achieve this result the Court first devalues the State's interest under these circumstances, noting that "no interest the State may have in preserving the physical integrity of a privately owned flag was significantly impaired on these facts . . . ." The Court takes pains to point out that appellant did not "permanently disfigure the flag or destroy it," and emphasizes that the flag was displayed "in a way closely analogous to the manner in which flags have always been used to convey ideas." The Court then restates the notion that such state interests are secondary to messages which are "direct, likely to be understood, and within the contours of the First Amendment." *Ante,* at 415. In my view the first premise demonstrates a total misunderstanding of the State's interest in the integrity of the American flag, and the second premise places the Court in the position either of ultimately favoring appellant's message because of its subject matter, a position about which almost all members of the majority have only recently expressed doubt, or, alternatively, of making the flag available for a limitless succession of political and commercial messages. I shall treat these issues in reverse order.

The statute under which appellant was convicted is no stranger to this Court, a virtually identical statute having been before the Court in *Halter* v. *Nebraska,* 205 U. S. 34 (1907). In that case the Court held that the State of Nebraska could enforce its statute to prevent use of a flag representation on beer bottles, stating flatly that "a State will be wanting in care for the well-being of its people if

it ignores the fact that they regard the flag as a symbol of their country's power and prestige . . . ." *Id.*, at 42. The Court then continued: "Such an use tends to degrade and cheapen the flag in the estimation of the people, as well as to defeat the object of maintaining it as an emblem of National power and National honor." *Ibid.*

The Court today finds *Halter* irrelevant to the present case, pointing out that it was decided almost 20 years before the First Amendment was applied to the States and further noting that it involved "commercial behavior," a form of expression the Court presumably will consider another day.[1] Insofar as *Halter* assesses the State's interest, of course, the Court's argument is simply beside the point. But even as the argument relates to appellant's interest, I find it somewhat difficult to grasp. The Court may possibly be suggesting that political expression deserves greater protection than other forms of expression, but that suggestion would seem quite inconsistent with the position taken in *Lehman* v. *Shaker Heights, ante,* p. 298,[2] by nearly all Members of the major-

---

[1] The Court states in a footnote: "There is no occasion in this case to address the application of the challenged statute to commercial behavior. Cf. *Halter* v. *Nebraska,* 205 U. S. 34 (1907)." *Ante,* at 413 n. 7.

[2] The plurality opinion of MR. JUSTICE BLACKMUN took the position that a ban against political advertising on publicly owned buses was not unconstitutional since "[n]o First Amendment forum is here to be found." MR. JUSTICE DOUGLAS, concurring in the judgment, stated that petitioner in that case had no "constitutional right to spread his message before this captive audience," but specifically noted:

"I do not view the content of the message as relevant either to petitioner's right to express it or to the commuters' right to be free from it. Commercial advertisements may be as offensive and intrusive to captive audiences as any political message." MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART, MR. JUSTICE

ity in the instant case. Yet if the Court is suggesting that *Halter* would now be decided differently, and that the State's interest in the flag falls before any speech which is "direct, likely to be understood, and within the contours of the First Amendment," that view would mean the flag could be auctioned as a background to anyone willing and able to buy or copy one. I find it hard to believe the Court intends to presage that result.

Turning to the question of the State's interest in the flag, it seems to me that the Court's treatment lacks all substance. The suggestion that the State's interest somehow diminishes when the flag is decorated with *removable* tape trivializes something which is not trivial. The State of Washington is hardly seeking to protect the flag's resale value, and yet the Court's emphasis on the lack of actual damage to the flag suggests that this is a significant aspect of the State's interest. Surely the Court does not mean to imply that appellant *could* be prosecuted if he subsequently tore the flag in the process of trying to take the tape off. Unlike flag-desecration statutes, which the Court correctly notes are not at issue in this case, the Washington statute challenged here seeks to prevent personal *use* of the flag, not simply particular forms of *abuse*. The State of Washington has chosen to set the flag apart for a special purpose, and has directed that it not be turned into a common background for an

---

MARSHALL, and MR. JUSTICE POWELL joined, dissenting, stated: "There is some doubt concerning whether the 'commercial speech' distinction announced in *Valentine* v. *Chrestensen*, 316 U. S. 52 (1942), retains continuing validity," referring to MR. JUSTICE DOUGLAS' concurring opinion in *Cammarano* v. *United States*, 358 U. S. 498, 514 (1959). The dissent further stated: "Once a public forum for communication has been established, both free speech and equal protection principles prohibit discrimination based *solely* upon subject matter or content." (Emphasis in original.)

endless variety of superimposed messages. The physical condition of the flag itself is irrelevant to that purpose.

The true nature of the State's interest in this case is not only one of preserving "the physical integrity of the flag," [3] but also one of preserving the flag as "an important symbol of nationhood and unity." [4] Although the Court treats this important interest with a studied inattention, it is hardly one of recent invention and has previously been accorded considerable respect by this Court. In *Halter,* for example, the Court stated:

> "As the statute in question evidently had its origin in a purpose to cultivate a feeling of patriotism among the people of Nebraska, we are unwilling to adjudge that in legislation for that purpose the State erred in duty or has infringed the constitutional right of anyone. On the contrary, it may reasonably be affirmed that a duty rests upon each State in every legal way to encourage its people to love the Union with which the State is indissolubly connected." 205 U. S., at 43.

There was no question in *Halter* of physical impairment of a flag since no actual flag was even involved. And it certainly would have made no difference to the Court's discussion of the State's interest if the plaintiff in error in that case had chosen to advertise his product by decorating the flag with beer bottles fashioned from some removable substance. [5] It is the character, not the cloth, of the flag which the State seeks to protect.

---

[3] *Smith* v. *Goguen,* 415 U. S. 566, 591 (1974) (BLACKMUN, J., dissenting).

[4] *Id.,* at 587 (WHITE, J., concurring in judgment).

[5] It should be noted that *Halter* makes no mention of the argument that allowing use of the flag for a personal or commercial purpose might suggest endorsement of that purpose by the government. While this might be an *additional* state interest in appropriate cases,

The value of this interest has been emphasized in recent as well as distant times. Mr. Justice Fortas, for example, noted in *Street* v. *New York,* 394 U. S. 576, 616 (1969), that "the flag is a special kind of personalty," a form of property "burdened with peculiar obligations and restrictions." *Id.,* at 617 (dissenting opinion).[6] MR. JUSTICE WHITE has observed that "[t]he flag is a national property, and the Nation may regulate those who would make, imitate, sell, possess, or use it." *Smith* v. *Goguen,* 415 U. S., at 587 (concurring in judgment). I agree. What appellant here seeks is simply license to use the flag however he pleases, so long as the activity can be tied to a concept of speech, regardless of any state interest in having the flag used only for more limited purposes. I find no reasoning in the Court's opinion which convinces me that the Constitution requires such license to be given.

The fact that the State has a valid interest in preserving the character of the flag does not mean, of course, that it can employ all conceivable means to enforce it. It certainly could not require all citizens to own the flag or compel citizens to salute one. *Board of Education* v. *Barnette,* 319 U. S. 624 (1943). It presumably cannot punish criticism of the flag, or the principles for which it stands, any more than it could punish criticism of this country's policies or ideas. But the statute in this case demands no such allegiance. Its operation does not depend upon whether the flag is used for communicative or noncommunicative purposes; upon whether a particular message is deemed commercial or political; upon whether the use of the flag is respectful or contemptuous; or upon whether any particular seg-

---

it is by no means an indispensable element of the State's concern about the integrity of the flag.

[6] The majority of the Court in *Street* stated: "We add that disrespect for our flag is to be deplored no less in these vexed times than in calmer periods of our history," 394 U. S., at 594, citing *Halter.*

ment of the State's citizenry might applaud or oppose the intended message.[7] It simply withdraws a unique national symbol from the roster of materials that may be used as a background for communications. Since I do not believe the Constitution prohibits Washington from making that decision, I dissent.

---

[7] It is quite apparent that the Court does have considerable sympathy for at least the *form* of appellant's message, describing his use of the flag as "a pointed expression of anguish," *ante,* at 410, and commenting that "appellant chose to express his own views in a manner that can fairly be described as gentle and restrained 'as compared to the actions undertaken by a number of his peers." *Ante,* at 415 n. 10. One would hope that this last observation does not introduce a doctrine of "comparative" expression, which gives more leeway to certain forms of expression when more destructive methods of expression are being employed by others.