[No. 60991-2-I.   Division One.   June 8, 2009.]

THE STATE OF WASHINGTON, *Respondent*, v. HELEN D. IMMELT, *Petitioner*.

---

*Helen D. Immelt*, pro se.

*Janice E. Ellis, Prosecuting Attorney*, and *Charles F. Blackman, Deputy*, for respondent.

¶1 GROSSE, J. — A duly enacted ordinance proscribing the honking of a horn for other than public safety reasons is entitled to a presumption of constitutionality. Horn honking per se is not free speech. Here, the context in which the defendant repeatedly honked her car horn did not constitute speech as there was no particularized message. The RALJ court is affirmed.

## FACTS

¶2 Helen Immelt lives on a cul-de-sac in a development governed by restrictive covenants. On May 9, 2006, the neighborhood homeowners' association sent Immelt a letter informing her that the covenants prohibited her from keeping chickens in her backyard. On the afternoon of May 12, Immelt yelled and cursed at her neighbor, Tara Knudson, demanding to know if she was behind the association's letter. Unaware of the letter and feeling threatened by Immelt's accusations, threats, and demeanor, Knudson notified the police. After leaving Knudson's house, Immelt confronted Jeremy Brumbaugh, the president of the homeowners' association, regarding the letter. A shouting match ensued, attracting three neighbors. One of those neighbors, John Vorderbrueggen, admitted that it was he who had complained to the association about Immelt's chickens.

¶3 At 5:50 a.m. the next day, Immelt parked in front of the Vorderbrueggen house and honked her horn for approximately 10 minutes. Vorderbrueggen was awoken by the incessant horn honking. He recognized the car as one that had been parked in Immelt's driveway. Vorderbrueggen

called 911. He observed the car drive away and then return to the front of his house. He saw Immelt driving and she waved to him as she drove by. Immelt later called him, mentioned her chickens, and said she wanted to make sure he was up for that 6:00 a.m. wake-up call. At about 8:00 a.m., Vorderbrueggen heard horn honking again. The sound was similar to the horn he had heard earlier that morning.

¶4 Brumbaugh was also awoken by Immelt's horn honking. He looked across the street and saw Immelt in her car. Another neighbor, Michael Menalia, testified that he saw Immelt in a parked car which had its horn blaring. He observed Immelt drive away from in front of Vorderbrueggen's house and then around the cul-de-sac while still honking the horn. The horn honking stopped only when Immelt got out of her car. At approximately 8:00 a.m., Menalia observed a police car at a neighbor's driveway. As he started to walk toward that neighbor, he saw Immelt get into her car and drive down the street. When Immelt saw Menalia, she started honking the horn again. Menalia then smiled, blew a kiss, and waved at Immelt. He denied making any obscene gesture.

¶5 Sergeant David Casey testified that he responded to a call that came into the police station at 6:03 a.m. He did not arrive in the neighborhood until approximately 7:00 a.m. After interviewing and asking for a statement from Vorderbrueggen, Sergeant Casey went to Immelt's house and requested that she cease honking her horn. Immelt became heated and claimed the car's horn did not work. At the same time, she claimed that it went off all by itself. Sergeant Casey requested that Immelt show him the car and the horn problem, but she declined to do so. Sergeant Casey informed Immelt that if she continued to blow the horn, he was going to have to arrest her. After assuring himself that Immelt understood, Sergeant Casey returned to Vorderbrueggen's to obtain his statement. Vorderbrueggen was still writing his statement when Sergeant Casey observed Immelt pull out of her driveway. As the car passed,

he heard the car horn sound three long blasts. Sergeant Casey left, validated Immelt's horn honking with Menalia, and pulled Immelt over to arrest her. Immelt again denied honking her horn, but after being advised that someone had witnessed her honking, she said that she honked in response to Menalia's making an obscene gesture at her.

¶6 Immelt did not testify in her defense. After a three-day jury trial, Immelt was convicted of violating the county noise ordinance, Snohomish County Code (SCC) 10.01.040 and .080(3). She appealed, contending, inter alia, that the noise ordinance was unconstitutional as it was vague, overbroad, and interfered with her right to free speech. A commissioner of this court granted discretionary review for the limited purpose of determining whether the ordinance under which Immelt was prosecuted is constitutionally valid.

## ANALYSIS

¶7 Immelt contends that SCC 10.01.040(1)(d) and .080(3) are unconstitutionally vague and overbroad, both facially and as applied, under both the United States and Washington State Constitutions, because they criminalize protected speech. The purpose of Snohomish County's noise control ordinance is

> to minimize the exposure of citizens to the physiological and psychological dangers of excessive noise and to protect, promote and preserve the public health, safety and welfare. It is the express intent of the county to control the level of noise in a manner which promotes the use, value and enjoyment of property; sleep and repose; commerce; and the quality of the environment.[1]

---

[1] SCC 10.01.010(1).

It is unlawful for any person to cause or allow sound that is a public disturbance noise.[2]

> "Public disturbance noise" means any sound which, because of its random or infrequent occurrence, is not conducive to measurement under the quantitative standards established in SCC 10.01.030; and endangers or injures the safety or health of humans or animals, or endangers or damages personal or real property, or annoys, disturbs or perturbs any reasonable person of normal sensitivities, or is specifically included in those listed in SCC 10.01.040(1) or 10.01.040(2).[3]

A public disturbance noise includes "[t]he sounding of vehicle horns for purposes other than public safety."[4] It is a civil infraction to violate SCC 10.01.040 and a misdemeanor to commit a second infraction within a 24 hour period.[5]

¶8 The same rules of statutory construction apply to the interpretation of municipal ordinances as apply to the interpretation of state statutes.[6] The constitutionality of an ordinance is one of law, which is reviewed de novo.[7] A duly enacted ordinance is presumed constitutional, requiring the party challenging it to demonstrate that it is unconstitutional beyond a reasonable doubt.[8]

¶9 Although the First Amendment protects only "speech," conduct may be sufficiently imbued with elements of communication to fall within the ambit of the First Amendment.[9] Courts, however, have rejected the view that any conduct can be labeled speech whenever the actor

---

[2] SCC 10.01.040.

[3] SCC 10.01.020(25).

[4] SCC 10.01.040(1)(d).

[5] SCC 10.01.080(3).

[6] *City of Puyallup v. Pac. Nw. Bell Tel. Co.*, 98 Wn.2d 443, 448, 656 P.2d 1035 (1982).

[7] *State v. Abrams*, 163 Wn.2d 277, 282, 178 P.3d 1021 (2008).

[8] *Kitsap County v. Mattress Outlet*, 153 Wn.2d 506, 509, 104 P.3d 1280 (2005).

[9] *Texas v. Johnson*, 491 U.S. 397, 404, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989).

intends to express an idea.[10] For such conduct to be considered protected speech, the actor must have the intent to convey a particularized message in circumstances where it is likely that the message would be understood.[11] To determine whether conduct is speech, one must look at the conduct that actually occurred and the context in which it occurred.[12] "Conduct is expressive when the actor intends to communicate a particular message by his actions and that message will be understood by those who observe it because of the surrounding circumstances."[13] Horn honking per se is neither expressive conduct nor speech. Therefore, such conduct does not implicate the First Amendment unless the context in which it occurred establishes it as such.[14] Horn honking which is done to annoy or harass others is not speech.[15]

¶10 Here, Immelt was unhappy with Vorderbrueggen for complaining to the homeowners' association about her chickens. She honked her horn repeatedly at 6:00 a.m. while in front of his house to retaliate. After being explicitly warned by a police officer not to do it again, she drove down the street and honked her horn three long times when she saw another neighbor involved with the association's decision. Nothing in the record indicates that this conduct was done for any reason other than for purposes of harassment.

¶11 Immelt's argument that the first sounding of her horn was to protest the homeowners' association's actions

---

[10] *Johnson*, 491 U.S. at 404; *Spence v. State*, 418 U.S. 405, 409-10, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974).

[11] *Johnson*, 491 U.S. at 404.

[12] *City of Seattle v. McConahy*, 86 Wn. App. 557, 567, 937 P.2d 1133 (1997).

[13] *McConahy*, 86 Wn. App. at 567 (citing *Spence*, 418 U.S. at 410-11).

[14] *Meaney v. Dever*, 326 F.3d 283, 287-88 (1st Cir. 2003) (sounding truck horn continuously while passing outside city hall during mayor's inauguration is not speech).

[15] *State v. Compas*, 1998 MT 140, 290 Mont. 11, 964 P.2d 703, 706 (conviction for disorderly conduct upheld where defendant sounded loud, continuous blasts when passing a recreational vehicle park and campground that she considered an eyesore).

and the second instance was in response to a neighbor making an obscene gesture is not supported by the record. The first horn honking incident occurred in front of the neighbor who had reported her covenant violation to the association, not in front of the home of the president of the homeowners' association. When stopped by Sergeant Casey, Immelt offered three different and contradictory explanations: (1) she did not do it, (2) the horn sounded by itself, and (3) she did it in response to a neighbor (Menalia) making an obscene gesture. But Menalia testified and denied making any obscene gesture as alleged. Rather, he testified that his wave and blown kiss were in response to Immelt's repeatedly honking her horn at him as she drove by.

¶12 Immelt relies on *City of Eugene v. Powlowski*[16] to support her position. The Oregon Court of Appeals struck down an ordinance banning the use of a horn for purposes other than as a reasonable warning as violating the Oregon Constitution.[17] But *Powlowski* is distinguishable. There, the court found the horn honking was in fact speech since the context there demonstrated "support or disapproval of a political issue or a matter of public concern." 116 Or. App. at 189. But only after determining that the threshold question, whether the conduct constituted speech, was met did the court examine the constitutionality of the ordinance. "[Horn blowing] is not an expressive act *a fortiori*, and thus does not implicate the First Amendment unless context establishes it as such."[18] Here, the conduct does not amount to speech.

## Void for Vagueness

¶13 Immelt contends that the ordinance is void for vagueness, facially and as applied, because it does not

---

[16] 116 Or. App. 186, 840 P.2d 1322 (1992).

[17] *State v. Hagel*, 210 Or. App. 360, 149 P.3d 1286 (2006) (following *Powlowski* in striking down a similarly worded statute).

[18] *Meaney*, 326 F.3d at 288 (citing *Johnson*, 491 U.S. at 404-06).

define "public safety purpose." The due process clause of the Fourteenth Amendment requires that citizens be afforded a fair warning of proscribed conduct.[19] In order to succeed in her vagueness claim, Immelt must prove that the ordinance either (1) fails to sufficiently define the offense so that people of "common intelligence" can understand what conduct is proscribed or (2) fails to provide ascertainable standards of guilt to protect against arbitrary enforcement.[20]

¶14 Under the first prong, Immelt argues that a person of common intelligence cannot agree on what the sounding of a vehicle horn for purposes other than public safety would mean. But " '[s]ome measure of vagueness is inherent in the use of language.' "[21] In *Weil v. McClough*,[22] the court held that there was an element of expression in the defendant's honking of his horn in a New York City traffic jam, but the *Weil* court also noted that simply because such "conduct has a communicative element[, it] does not make a statute prohibiting or limiting that conduct *per se* unconstitutional."[23] The *Weil* court held the contested New York ordinance reasonably related to two significant governmental interests—reducing noise and maximizing the utility of car horns. Here, the ordinance clearly proscribes the honking of horns for purposes other than public safety. Persons of ordinary intelligence can comprehend the term "public safety."

¶15 The Fourteenth Amendment due process clause requires a penal statute to provide adequate standards to protect against arbitrary, erratic, and discriminatory en-

---

[19] *City of Spokane v. Douglass*, 115 Wn.2d 171, 178, 795 P.2d 693 (1990).

[20] *Douglass*, 115 Wn.2d at 178-79.

[21] *State v. Watson*, 160 Wn.2d 1, 7, 154 P.3d 309 (2007) (alteration in original) (quoting *Haley v. Med. Disciplinary Bd.*, 117 Wn.2d 720, 740, 818 P.2d 1062 (1991)).

[22] 618 F. Supp. 1294 (S.D.N.Y. 1985).

[23] *Weil*, 618 F. Supp. at 1296 (citing *Cox v. Louisiana*, 379 U.S. 536, 555, 85 S. Ct. 453, 13 L. Ed. 2d 471 (1965)).

forcement.[24] The mere fact that a police officer has to exercise a degree of subjective evaluation to determine whether an ordinance applies does not make that ordinance unconstitutionally vague.[25] Here, the police officer warned Immelt not to honk her horn again. Shortly after his warning, Immelt drove down the street and for no apparent reason connected to public safety honked her horn several times. Further, the ordinance requires that the conduct must occur twice within a 24 hour period before a criminal citation can be issued. Under the particular facts here, there was not an "inordinate amount of police discretion."[26]

¶16 Although Immelt contends the ordinance is unconstitutional under Washington's constitution, she does not assert any argument as to why article I, section 3 of the state constitution is more protective here than the federal constitution. Furthermore, she has not addressed the criteria set forth in *State v. Gunwall*.[27] Accordingly, we limited our analysis to the federal constitutional law issue.

¶17 The RALJ court is affirmed.

AGID and COX, JJ., concur.

Review granted at 167 Wn.2d 1008 (2009).

---

[24] *Douglass*, 115 Wn.2d at 180.

[25] *Am. Dog Owners Ass'n v. City of Yakima*, 113 Wn.2d 213, 216, 777 P.2d 1046 (1989).

[26] *Douglass*, 115 Wn.2d at 181 (citing *Am. Dog Owners Ass'n*, 113 Wn.2d at 216).

[27] 106 Wn.2d 54, 61-62, 720 P.2d 808 (1986).