OPINION OF THE COURT
Matthew A. Sciarrino, Jr., J.
The defendant, a “member” of the “Occupy Wall Street Movement” (OWS), is charged with trespass (Penal Law § 140.05), disorderly conduct (Penal Law § 240.20 [6]) and obstructing governmental administration in the second degree (Penal Law § 195.05) as a result of the alleged incidents that occurred on November 15, 2011 during the “eviction” of the occupiers from Zuccotti Park.
The defendant, Ronnie Nunez now moves the court for an order inter alia: dismissing the accusatory instrument pursuant to Criminal Procedure Law § 170.30 (1) (a) and pursuant to Criminal Procedure Law § 170.30 (1) (f). That motion is denied.
An accusatory instrument upon which the defendant may be held for trial “must allege ‘facts of an evidentiary character’ (CPL 100.15 [3]) demonstrating ‘reasonable cause’ to believe that the defendant committed the crime charged (CPL 100.40 [4] [b]).” (People v Dumas, 68 NY2d 729, 731 [1986].) Further, a valid criminal court information must contain nonhearsay factual allegations which, if true, “establish . . . every element of the offense charged and the defendant’s commission thereof.” (CPL 100.40 [1] [c].)
In determining the facial sufficiency of an accusatory instrument, the court must view the facts in the light most favorable to the People. (People v Contes, 60 NY2d 620, 621 [1983].) “That other, innocent inferences could possibly be drawn from the facts is irrelevant on this pleading stage inquiry. . . .” (People v Deegan, 69 NY2d 976, 979 [1987].) “So long as the factual allegations of an information give an accused notice sufficient to prepare a defense and are adequately detailed to prevent a defendant from being tried twice for the same offense, they should be given a fair and not overly restrictive or technical reading.” (People v Casey, 95 NY2d 354, 360 [2000] [citations omitted].)
*175 Additionally, in making a determination as to the facial sufficiency of an accusatory instrument, “the court is bound by the four corners of the accusatory instrument and may not consider extraneous allegations contained in a motion to dismiss or an answer to a motion to dismiss.” (People v Voelker, 172 Misc 2d 564, 569 [Crim Ct, Kings County 1997], citing People v Alejandro, 70 NY2d 133, 138 [1987].)
The within accusatory instrument states that on November 15, 2011, at about 5:30 a.m. in New York County:
“deponent observed the defendant knowingly and unlawfully remain inside [Zuccotti Park] with a crowd of people after deponent observed and heard a NYPD Captain advise the group that they must leave the premises via bull-horn.
“Deponent states that deponent is informed by Michael Fischetti, Property Manager, with Brookfield Properties that Brookfield Properties is the custodian of the park at the above location and gave the New York City Police Department permission and authority to evacuate all people from within the location. As of [November 15, 2011 at or about 5:30 a.m.] permission and authority for any individual to remain at the location was withdrawn.
“Deponent states that after the above order was given deponent observed the defendant seated on the ground at the above location and the defendant had his arms locked with other persons in that the defendants’ arms were interlocked with the arms of other adjacent persons. Deponent further states that the deponent attempted to separate the defendants from each other and the additional adjacent persons and the defendants tightened their arms to prevent the deponent from removing the defendants from said other persons, in that the defendants’ arms, bent at the elbow, were moved closer and more tightly to their bodies by the defendants.
“Deponent further states that the defendants’ above stated conduct prevented the deponent from conducting a lawful duty and official function, specifically a police operation and to disperse persons from the above location.”
Trespass (Penal Law § 140.05)
Pursuant to Penal Law § 140.05, “[a] person is guilty of trespass when he knowingly enters or remains unlawfully in or *176 upon premises.” Additionally, in defining the term “enter or remain unlawfully,” the Penal Law explains:
“A person ‘enters or remains unlawfully’ in or upon premises when he is not licensed or privileged to do so. A person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or other authorized person.” (Penal Law § 140.00 [5].)
In order to fully discuss the issues involved some understanding of the property involved is necessary. While the court is “bound by the four corners of the accusatory instrument,” as to the sufficiency issue, one cannot view the allegations in a complete vacuum. Additionally, the consideration of various issues are necessary to decide the prong of the defendant’s motion seeking a dismissal pursuant to CPL 170.30 (1) (f).
Discussion
Zuccotti Park,[1] located in Lower Manhattan, was originally created in 1968 by United States Steel via a city planning special permit. The park is a privately owned public space (POPS) presently owned by Brookfield Properties (Brookfield) and is open for public use. Zuccotti Park, as is typical with POPS, is intended to be used by the public for passive recreation, rather than for active recreation or sports activities and is to remain open 24 hours a day, seven days a week unless permission for regular closures is approved by the City Planning Commission (CPC).
On or about September 17, 2011, members of a protest movement[2] that ultimately came to be known as “Occupy Wall Street” established a base of operations inside of Zuccotti Park. *177 In addition to using the park as a meeting and organizational space, the occupiers also appeared to have turned the park into a campground, erecting a small number of tents and other structures in the park. A New York Times article entitled How Occupy Wall Street Turned Zuccotti Park Into a Protest Camp, maps out the different areas in the park including a sleeping section, an area for supplies, medical care, clothing and sanitation, a kitchen with donated food, a media section a meeting area and even a library. (Bedel Saget and Archie Tse, How Occupy Wall Street Turned Zuccotti Park Into a Protest Camp, New York Times, Oct. 5, 2011.)[3] Wired described Zuccotti Park as a:
“little city within the Big City, with its own library, medical center (often staffed by volunteer nurses and doctors), information center, a common kitchen dispensing thousand[s] of meals a day, and even its own tough neighborhood — the West side. People filled the walkways and sidewalks surrounding the occupation day and night. They ate, chatted, held spontaneous teach-ins and occasionally nasty fights.” (Quinn Norton, Scenes From the Occupation: Before and After the Wall Street Eviction, Wired, Nov. 16, 2011.)[4]
Whether or not these were the conditions in existence at the times of the alleged incidents is of course to be determined at the trials of this and other similarly situated defendants.
In late September, Brookfield promulgated rules of conduct for Zuccotti Park, which were apparently designed to ensure that the park would be able to be used for its intended purpose and to prevent the existence of perceived unlawful conditions that might potentially expose Brookfield to liability. These rules were posted at the entrance to the park.
Because occupiers were spread out across the park for 24 hours per day, the owners of the park claim that they were not able to perform routine maintenance or cleaning. On October 11, 2011, Brookfield sent a letter to Police Commissioner Raymond Kelly, requesting his assistance in allowing Brookfield to *178 conduct a cleaning, inspection and any necessary maintenance in Zuccotti Park.
Towards the end of October, the New York City Fire Department (NYFD) concluded that the conditions in the park created a situation in which there would be no clear path of exit should there be a fire in the park. The NYFD determined that it was necessary to order the removal of belongings from the park in order to mitigate the fire hazard. Accordingly, the Fire Commissioner issued a violation order to Brookfield directing that the combustible materials inside the park be removed and all other obstructions be cleared.
On November 14, 2011, Brookfield requested the City’s assistance in evacuating the park so it could be cleaned. Brookfield requested the help of the City and the New York City Police Department (NYPD) to rectify the unsafe and unlawful conditions by temporarily evacuating the occupiers.
On the morning of November 15, 2011, the NYPD began to clear Zuccotti Park. NYPD Community Affairs Officers circulated through the park distributing a notice from Brookfield, which requested that the occupiers temporarily leave the park so that it could be cleaned. According to the People, these written announcements were also read repeatedly by NYPD using megaphones.
The People claim that the occupiers were then given the opportunity to leave the park. Several hours elapsed between the commencement of directives to vacate at approximately 1:00 a.m. and the time at which the NYPD began arresting those who refused to leave. According to the People, many people, including the defendant, remained inside the park. The People state that a significant number of those arrested, including the defendant, sat on the ground inside the park, linked arms with each other, and actively resisted the efforts of the police to separate and remove them. The defendant, and others, were arrested and subsequently charged with trespass (Penal Law § 140.05), disorderly conduct (Penal Law § 240.20 [6]), and obstruction of governmental administration in the second degree (Penal Law § 195.05).
It should also be noted that the Occupy Movement did attempt to obtain a temporary restraining order (TRO) to be placed back in possession of the park. In Matter of Waller v City of New York (34 Misc 3d 371, 375 [Sup Ct, NY County 2011]) the court held that
*179 “To the extent that [C]ity law prohibits the erection of structures, the use of gas or other combustible materials, and the accumulation of garbage and human waste in public places, enforcement of the law and the owner’s rules appears reasonable to permit the owner to maintain its space in a hygienic, safe, and lawful condition, and to prevent it from being liable by the City or others for violations of law, or in tort. It also permits public access by those who live and work in the area who are the intended beneficiaries of this zoning bonus.”
The court also held that the protestors had no right to a TRO enjoining the City and Brookfield from evicting them and enforcing public and health safety laws (id.).
As the owner of Zuccotti Park, Brookfield must comply with the obligations imposed on all owners of POPS by the CPC. The Plaza Standards governing Zuccotti Park state that the park must be open and available for public use 365 days per year (NY City Zoning Resolution § 37-60). The People’s position is that the Plaza Standards governing Zuccotti Park do not preclude the owners from implementing reasonable rules, or require the owners to obtain advance approval of promulgated rules from the CPC.
The People further argue that the standards do not require that availability be offered without limitation. It is the People’s position that the applicable zoning resolutions requiring Brook-field to grant unregulated access to this space would be inconsistent with the concept of private ownership and would leave Brookfield powerless to meet its legal obligations as the owner of the POPS.[5]
In addition, Brookfield must also comply with the City’s rules and regulations. Under this regulatory scheme, while the park is considered “public space” for purposes of zoning law, Brook-field is singularly liable for fines and other penalties incurred for noncompliance with obligations imposed by the City. It is the People’s position that Brookfield did not lack the authority to pursue measures necessary to ensure that Zuccotti Park was maintained in a lawful fashion, even absent prior approval from the CPC.
*180 It is clear that if the allegations are proven true, the conditions in Zuccotti Park at the time of the order to vacate posed a serious hazard to the health and safety of those occupying the park, the City’s first responders, and the surrounding community. Moreover, the conditions also interfered with the community and general public’s ability to utilize the park for the passive recreation activities for which it was built. Faced with these deteriorating conditions, Brookfield temporarily revoked the license of the occupiers to remain in the park so that it could be cleaned and various fire and other safety hazards could be addressed. The People argue that these actions were lawful and within the scope of Brookfield’s authority. This court agrees.
This court holds that POPS owners may establish “rules of conduct,” so long as these restrictions on the use of the POPS are reasonable and designed to address nuisance or other conditions that would interfere with or are inconsistent with the intended use of the POPS by the general public. Those steps could include the temporary closing of the park for cleaning and other remedial actions, as long as the duration of the closure is as short as reasonably necessary to accomplish the goal.
New York City Zoning Resolution § 37-752 states that
“to ensure a safe and comfortable environment for all public plaza users, a maximum of one prohibition sign or ‘Rule of Conduct’ sign may be located within the public plaza . . . [s]uch signs shall not prohibit behaviors that are consistent with the normal public use of the public plaza such as lingering, eating, drinking of non-alcoholic beverages or gathering in small groups.”
The posted rules that Brookfield promulgated in September were designed to ensure that the park would be able to be used for its intended purpose and to prevent the existence of unlawful conditions that might expose Brookfield Properties to liability. These rules included a prohibition on (i) camping and the erection of tents and other structures; (ii) lying down on the ground or lying down on benches, sitting areas or walkways in a manner that unreasonably interferes with the use of benches, sitting areas or walkways by others; (iii) the placement of tarps or sleeping bags or other coverings on the property; and (iv) the storage or placement of personal property on the ground, benches, sitting areas or walkways in a manner that unreasonably interferes with the use of such areas by others.
*181 First Amendment[6]
By November of 2011, Zuccotti Park had allegedly been overridden with tents and tarps. This was prohibited in the rules promulgated by Brookfield. The defendant claims that he and others were exercising their First Amendment right by setting up the tents and tarps. This argument is without merit. The First Amendment does not offer absolute protection to all speech under all circumstances and in all places. (See Clark v Community for Creative Non-Violence, 468 US 288, 293 [1984].) Even in public forums, reasonable restrictions on the time, place or manner of protected speech may be imposed, provided that the restrictions are content neutral, are narrowly tailored to serve a significant government interest, and leave open sufficient alternative channels for communication of that information. (Id. at 294; Thomas v Chicago Park Dist., 534 US 316, 323 n 3 [2002].) In Waller v City of New York, the court found that Brookfield Properties has “the right to adopt reasonable rules that permit it to maintain a clean, safe, publicly accessible space consonant with the responsibility it assumed to provide public access according to law.” (34 Misc 3d at 375.) The court held that the petitioners had failed to demonstrate that the rules of conduct were not reasonable time, place and manner restrictions permitted under the First Amendment. On the contrary, the court reasoned that the rules appeared to be “reasonable to permit the owner to maintain its space in a hygienic, safe and lawful condition,” to forestall liability for torts or violations of law, and to permit public access to the park by those who live and work in the area. (Id.) This court agrees.
There exists no basis to conclude that Brookfield’s prohibitions were applied to the defendant and other members of Occupy Wall Street because of any disagreement with their message. These rules applied to anyone using the park. Rules will be considered “narrowly tailored” in the First Amendment context if they “target[ ] and eliminate[ ] no more than the exact source of the ‘evil’ [they] seek to remedy.” (Frisby v Schultz, 487 US 474, 485 [1988].) The rules need not be the least restrictive or intrusive available (Ward v Rock Against Racism, 491 US 781 [1989]) but rather they must only be found to “promote [ ] a substantial government interest that would be *182 achieved less effectively” absent the rule. (United States v Albertini, 472 US 675, 689 [1985].) The rules of conduct enacted by Brookfield Properties track the city laws, which prohibit the erection of structures in public spaces, the use of generators on public property, and the perpetuation of unhygienic conditions stemming from an accumulation of garbage and/or human waste in public places.
In Clark v Community for Creative Non-Violence (468 US 288 [1984]), a group protesting homelessness argued that a National Park Service regulation prohibiting camping in certain parks violated the First Amendment insofar as it prohibited them from sleeping in Lafayette Park and the mall. The regulation banned use of the park for living accommodations. {Id. at 290-291.) The Court concluded that it was a defensible time, place and manner restriction. {Id. at 294.) The Court reasoned that the regulation “narrowly focuse[d]” on the “substantial interest in maintaining the parks” in an “attractive and intact condition, readily available” to the many others who wish to use them. {Id. at 296.)
While it is possible for conduct that is symbolic or expressive in nature to be considered speech for purposes of First Amendment analysis, it is well settled that not all conduct intended to convey a message constitutes expressive speech. (United States v O’Brien, 391 US 367, 376 [1968].) Instead, courts use a two-pronged test to determine if conduct will be considered expressive: first, the intent of the conduct must be to convey a particularized message; and second, there must be a great likelihood that the message would be understood by those who viewed it, given all of the surrounding circumstances. (Spence v Washington, 418 US 405, 409-410 [1974].) Under this test, erecting tents and other structures in Zuccotti Park did not qualify as protected speech and there is no reason to conclude that camping in Zuccotti Park conveyed any particular message.
Finally, as stated in Lubavitch Chabad House, Inc. v City of Chicago (917 F2d 341, 347 [7th Cir 1990]) the Constitution does not give individuals the right to erect structures on public property. The court declared, “Public parks are certainly quintessential public forums where free speech is protected, but the Constitution neither provides, nor has it ever been construed to mandate, that any person or group be allowed to erect structures at will.”
It is clear that setting up tents and other structures would be a violation of the reasonable rules established by Brookfield. *183 The arrangement of tents, other structures as well as the people and their personal belongings presented a grave safety risk in the event of a fire. The potential for loss of life or injury as people would have to navigate over and around other people, belongings, tents and other structures to exit the park in the event of a fire or other emergency could have been significant. There is no doubt that if these conditions existed that the ignition of a fire anywhere in the park would pose a grave risk of significant loss of life. This risk clearly would be heightened by the alleged prevalence of smoking and cooking in a relatively small space.
The actions of Brookfield were narrowly tailored to protect both itself from liability and those at risk because of the unsafe conditions inside Zuccotti Park. A written announcement describing what was taking place was disseminated throughout the park by police officers from community affairs, and that announcement was read repeatedly over bullhorns by uniformed members of the NYPD. This announcement informed occupiers that they had to temporarily evacuate the park with all of their property so that the park could be cleared and restored for its intended use. The announcement explicitly stated that it was being made on behalf of the owner of the park, Brookfield as well as the City of New York. The NYPD then apparently placed blockades and other measures to monitor and control the situation upon its reopening, which the People state was done later that day.
For the reasons stated above, it is clear that when the defendant was ordered by the police to vacate the park, he was not legally entitled to refuse. By so refusing to leave after his license to be in the park had been lawfully revoked, the defendant allegedly committed a trespass.
Accordingly, while at this stage of the process the court is not dismissing this count either pursuant to CPL 170.30 (1) (a) or (f), it should be noted that it is reasonable to assume that given that numerous lawyers, and countless hours have been spent on what is a fairly complex legal issue, that the prosecution will have a difficult case to prove an actual intent to trespass. Clearly whether or not the defendant intended to tresspass was not a simple issue due to the many complexities of the eviction.
Disorderly Conduct (Penal Law § 240.20 [6])
A person is guilty of disorderly conduct pursuant to Penal Law § 240.20 (6) “when, with intent to cause public inconve *184 nience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse.”
The factual allegations contained in the within accusatory instrument sufficiently allege the elements of the charge. As stated above, the “intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof’ is evidenced by the alleged acts of locking arms with others and that the defendant tightened his arms to prevent the NYPD from removing himself and other persons thereby preventing the NYPD from enforcing its order to disperse from the location.
These factual allegations are sufficient to support the charge of Penal Law § 240.20 (6) and the defendant’s motion to dismiss this count either pursuant to CPL 170.30 (1) (a) or (f) is denied.
Obstructing Governmental Administration in the Second Degree (Penal Law § 195.05)
A person is guilty of obstructing governmental administration in the second degree (Penal Law § 195.05) “when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference.”
The charge of obstructing governmental administration (Penal Law § 195.05) is facially sufficient. The defendant attempted to prevent the police officer from performing an official function, that being to remove the defendant from the premises. The accusatory instrument alleges that when the NYPD Captain advised the defendant by bullhorn that he must leave the premises, the defendant sat down in the park and interlocked arms with other persons. The defendant is also alleged to have tightened his arms with others to prevent the deponent from removing the defendant from the said location. Contrary to the defense assertion, it is not necessary to allege that the removal was authorized in order for the charge to be facially sufficient.
These words are not found in the statute and the accusatory instrument is sufficient so long as the factual allegations contained therein delineate what the obstruction and official function consist of (cf. Matter of Carlos G., 215 AD2d 165 [1995]). Therefore, whether or not the removal, which constitutes the “official function” alleged to have been obstructed, was authorized need not be made part of the pleadings. (People v Cacsere, 185 Misc 2d 92, 93 [App Term, 2d Dept 2000].)
*185 The factual allegations are, therefore, sufficient to support the charge of obstructing governmental administration in the second degree (Penal Law § 195.05). (See Cacsere, supra, People v Stewart, 32 Misc 3d 133[A], 2011 NY Slip Op 51445[U] [App Term 2d, 11th & 13th Jud Dists 2011], lv denied 18 NY3d 861 [2011]; People v Ballard, 28 Misc 3d 129[A], 2010 NY Slip Op 51221[U] [App Term, 9th & 10th Jud Dists 2010].)
The defendant’s motion to dismiss the charge of obstructing governmental administration in the second degree (Penal Law § 195.05) for facial insufficiency is, therefore, denied. Likewise the application to dismiss for some jurisdictional or legal impediment to conviction pursuant to CPL 170.30 (1) (f) is denied.
Conclusion
While, this court recognizes that the intentions of numerous members of the OWS Movement are laudable, that does not arguably excuse one’s obligations to work within the lawful process allowed in our democratic society. The “99%” is clearly a majority and can make its voices heard in a legal, organized manner if that is its wish. No matter the alleged influence of the “1%” on the political process, at the end of the day it is the majority that determines those that have the privilege of governing this city, state and nation.
Accordingly, it is hereby ordered that the defendant’s motion to dismiss the charge of trespass (Penal Law § 140.05) for facial insufficiency or for some jurisdictional or legal impediment to conviction is denied; and it is further ordered, that the defendant’s motion to dismiss the charge of disorderly conduct (Penal Law § 240.20 [6]) for facial insufficiency or for some jurisdictional or legal impediment to conviction is denied; and it is further ordered, the defendant’s motion to dismiss the charge of obstructing governmental administration in the second degree (Penal Law § 195.05) for facial insufficiency or for some jurisdictional or legal impediment to conviction is denied; and it is further ordered, that all other aspects of the defendant’s motion not addressed are likewise denied, including an inferred motion to dismiss the accusatory instrument in the furtherance of justice.

. Zuccotti Park, formerly Liberty Plaza Park, covers approximately 33,000 square feet in Lower Manhattan. The park is situated beside One Liberty Plaza between Broadway, Trinity Place, Liberty Street and Cedar Street. The park was heavily damaged in the September 1, 2001 attack on America. The plaza has been used as the site of several events commemorating the anniversary of the attacks. After renovations in 2006, the park was renamed by its current owner, Brookfield, after company chairman John Zuccotti.

. While, it is not for this court to state what the message of the OWS Movement is or is not, or whether or not it is for a good purpose, it appears that the primary message is that the working, middle and lower classes have suffered because of the financial industry’s alleged excesses and fraud. It is also apparent that the OWS Movement has clearly been successful in bringing *177 this issue to the forefront of public debate. However, for First Amendment and other purposes, whether the message is good or bad, agreeable or not, one’s personal views, whether for or against the movement, have no impact on this court’s decision.

. Http://www.nytimes.com/interactive/2011/10/05/nyregion/how-occupywall-street-turned-zuccotti-park-into-a-protest-camp.html.

. Http://www.wired.com/threatlevel/2011/ll/zuccotti-before-after/

. If this case was looked at through the eyes of a civil attorney, one might argue that if there was a negligence claim clearly the owner would be sued as a landlord, with the nondelegable duty to maintain the premises in a reasonably safe condition. Therefore, the landlord had the right to have the park cleared to maintain its property. (See PJI 2:90 et seq. and 2:91 et seq.)

. Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.