# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
June 9, 2015 Session

## STATE OF TENNESSEE v. NICOLE FLOWERS

**Appeal from the Circuit Court for Maury County**
**No. 22821     Robert L. Holloway, Jr., Judge**

---

**No. M2014-01744-CCA-R3-CD – Filed September 28, 2015**

---

The Defendant-Appellant, Nicole Flowers, was indicted by the Maury County Grand Jury for one count of stalking, a Class A misdemeanor. <u>See</u> T.C.A. § 39-17-315(b)(2) (Supp. 2012). Following a bench trial, Flowers was found guilty of the charged offense. The same day, the trial court imposed a sentence of eleven months and twenty-nine days to be served on supervised probation. On appeal, Flowers argues that the evidence is insufficient to support her conviction. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Claudia S. Jack, District Public Defender; Travis B. Jones, Assistant Public Defender, Columbia, Tennessee, for the Defendant-Appellant, Nicole Flowers.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Senior Counsel; Mike Bottoms; District Attorney General; and Kevin S. Latta, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Trial.** Jason Dale, the victim, testified that he had worked for the Maury County Board of Education for the last fifteen years. He stated that he had six children, including one daughter with Nicole Flowers, the Defendant-Appellant. Dale said that his daughter with Flowers[1] was fourteen years old on May 8, 2013.

---

[1] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred

In the days leading up to the incidents on May 8, 2013, the victim received "several text messages" from Flowers, wherein she called the victim a "deadbeat dad" and informed him that he needed to "step up one time in [his] life and be a father." He said these text messages were related to the issue of transporting their daughter to and from band practice. The victim said that he informed Flowers via text that he did not want to receive any more text messages from her. He did not remember any phone conversations with Flowers after he received the text messages from her but before he found the three signs calling him a "deadbeat."

At 6:25 p.m. on May 8, 2013, an individual at work informed the victim that a sign about him had been posted on the fence of the Maury County Board of Education. Although the victim usually arrived at work around 7:00 a.m., he went to work early that day after learning of the sign. When he arrived at work, the victim saw the sign posted on the fence that stated, "Jason Dale is a deadbeat." There was a second sign posted on the main gate that likewise stated, "Jason Dale is a deadbeat." The victim said that he took both of these signs down.

As the victim was leaving work on May 8, 2013, he saw Flowers and her sister, Priscilla Dawson, sitting in a gray Malibu Max that was parked just down the street. Flowers and Dawson followed him in their car as he exited the parking lot and continued to follow him as he drove in the direction of his home. The victim then drove to the sheriff's department and informed a magistrate of the events that had transpired. The magistrate instructed him to go to the police department to file a report on Flowers. The victim met with Detective Mike Barnett of the Columbia Police Department, filed a report regarding Flowers's conduct, and brought the report back to the magistrate, who issued a warrant for Flowers's arrest.

The victim said there was a third sign lying in his yard on May 8, 2013, which stated, "Jason Dale is a deadbeat dad, and he works for the Department of Education." His neighbor had found the sign first and had thrown it into a ditch in his yard. Although the victim had not seen who had placed the signs, he believed that they had been posted by Flowers because of her earlier text messages calling him a "deadbeat dad." When asked if there was anything else that he wanted the trial court to hear about this case, the victim replied:

> You know, I don't want my name defamed like that. You know, I wouldn't do my worst enemy like that. You know, this is something that, you know,

---

to as Mr. or Mrs. or by his or her proper title.

you don't do nobody like this, or jeopardize a job and everything like that.
You know, I wouldn't do that to nobody.

The victim stated that after the arrest warrant was issued on May 8, 2013, Flowers did not place any more signs at his home or work.

Flowers, the Defendant-Appellant, testified that she had known the victim for fifteen or sixteen years and that they had a daughter together. In the spring of 2013, their daughter was a flag girl in the marching band at Central High School.

Flowers said their daughter had talked to the victim, who told her that he was not going to transport her to and from band practice. When she learned of the victim's response, Flowers sent the victim some text messages, which included statements like "Step up and be a man for once in your life" and "You don't do anything else for her. The least you could do [is] give her a ride [to band practice]." She stated that the victim responded to her text messages.

Flowers said that after she sent these text messages, she called the victim. During this conversation, the victim told Flowers that he did not understand why she was bothering him about their daughter's transportation, and Flowers responded, "Don't worry about it. I'll get her there the best that I can." At the time of this conversation, the victim knew that Flowers did not have a driver's license. The victim then hung up on her. Flowers asserted that her phone records confirmed that this telephone conversation took place. Following this telephone conversation, Flowers did not try to contact the victim through text messages or phone calls.

Flowers acknowledged that she made signs stating that "Jason Dale is a deadbeat" and placed them at the victim's home and work the night of May 7, 2013. She said that prior to sending the text messages to the victim, she had not talked to him in three years, even though they had a daughter together.

Flowers also acknowledged that she and her sister, Priscilla Dawson, went to the victim's work on May 8, 2013. She said she went to the victim's place of employment "to see if [she and the victim] could have [a] sensible conversation about [the victim] getting [their daughter] back and forth [from band practice]" because she was "tired of paying people to get her back and forth." When Flowers was asked if the victim saw her at his work, she stated, "He might have looked over. I don't know."

When the victim left work, Flowers and Dawson, who was driving, followed the victim. She said that at one point, they "got beside [the victim] to let him know we [were] right here." However, she said that they did not swerve into the victim and did not

make any signals for him to pull over. Flowers said that as they were following the victim, the victim never said anything to her, never called her on her cell phone, and never told her to stop following him. She said the victim drove directly to the sheriff's department. At the time, she believed the victim went to the sheriff's department to meet with her on "neutral ground" so that she "wouldn't do anything to him, and he wouldn't do anything to [her]." However, when Flowers saw the victim enter the sheriff's department, she knew that they would not be having a discussion, and she and her sister left. Flowers said that since May 8, 2013, she has had no contact with the victim, and the victim had not spoken to their daughter.

Flowers asserted that she was not trying to frighten or terrorize the victim or cause the victim any sort of emotional distress with her actions. Instead, she claimed she was trying "to get a ride for my child back and forth to practice." Because the victim refused to help regarding the transportation of their daughter, Flowers paid people to drive their daughter back and forth to practice when her sister was unavailable to help.

Flowers explained why she contacted the victim about their daughter's transportation issues:

> I mean, her father doesn't deal with her, or have a relationship with her. He can walk by with the other kids and post pictures on Facebook and Instagram, and that's where she sees it all, and that's where she had a problem with it. As a parent, I stepped in. Up until that point[,] I hadn't said anything to [the victim] about it. I have over the years [told the victim] you are a deadbeat [father]. But once my child let me know that it bothered her, then, of course, it bothered me.

She added that the victim did not call their daughter when the daughter's sibling passed away three or four years prior. She said, "I'm not doing a defamation of character of him, but [the victim] is a deadbeat [father] to my child. I can't speak for the other mothers [of the victim's children]." Flowers admitted that on May 8, 2013, she was angry with the victim. She also admitted that she placed the signs so that other people would see that the victim was a "deadbeat" and so that the victim would feel bad.

Priscilla Dawson, Flowers's sister, testified that she was with Flowers the afternoon of May 8, 2013. Dawson believed that Flowers only wanted to talk to the victim about helping her transport their daughter. She explained why transportation for their daughter had been such a problem:

> [Their daughter] is my niece, and I love her, but I cannot continue to be the sole transportation. I have to work. I have to take off from my job to come

home to take her to the doctor, to the dentist. [The victim] provides no transportation for this child whatsoever.

Dawson acknowledged that she and Flowers saw the victim leave work on May 8, 2013, and then followed him. However, she asserted that she was not "riding his bumper," "blowing [her] horn," or "doing anything out of the normal."

When the trial court asked Dawson if she believed that the signs at the victim's workplace were going to encourage a meaningful discussion between the victim and Flowers, Dawson acknowledged that the signs were not as much "for them to have a meaningful discussion" as they were to let the victim know that the daughter was "a child" with "feelings" who was hurt when he treated her differently from his other children. When the court asked if the signs were posted for the benefit of the victim's employers rather than the victim, Dawson replied:

> I'm not going to say that it's so much [to] let [the victim's employers] know. It's just to let it be known that you can walk around with your head held up, and have a relationship with five of your six kids. But you make this one child feel so ostracized and so unimportant in your life, that what else—what is she supposed to do? She's a good kid. She goes to school. She makes good grades. You have no relationship with this child at all. When this child's grandmother died, and 52 days later, her sister died, [the victim] didn't pick that phone up and call that child at all.

When the trial court asked Dawson why she thought the victim would talk to Flowers after she posted the two signs at his work, Dawson responded, "I didn't know if he wanted to talk to her or not. It didn't really matter to me if he talked to her or not."

## ANALYSIS

Flowers argues that the evidence is insufficient to sustain her conviction for stalking. The State responds that the evidence is sufficient because the proof established that Flowers called and texted the victim, placed signs stating that the victim was a "deadbeat" at his work and home, and followed the victim after work. After addressing all of Flowers's specific arguments, we conclude that the evidence is sufficient to sustain her stalking conviction.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009). When considering the sufficiency of the evidence on

appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the trier of fact determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the trier of fact. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

An individual who intentionally engages in stalking commits a Class A misdemeanor. T.C.A. § 39-17-315(b)(1)(2). "Stalking" is defined as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested[.]" Id. § 39-17-315(a)(4). A "course of conduct" is "a pattern of conduct composed of a series of two (2) or more separate noncontinuous acts evidencing a continuity of purpose[.]" Id. § 39-17-315(a)(1). "Harassment," as it is used in the stalking statute, is defined as follows:

> Harassment means conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause

a reasonable person to suffer emotional distress, and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose[.]

Id. § 39-17-315(a)(3). "Unconsented contact" is defined as follows:

"Unconsented contact" means any contact with another person that is initiated or continued without that person's consent, or in disregard of that person's expressed desire that the contact be avoided or discontinued. Unconsented contact includes, but is not limited to, any of the following:

(A)     Following or appearing within the sight of that person;
(B)     Approaching or confronting that person in a public place or on private property;
(C)     Appearing at that person's workplace or residence;
(D)     Entering onto or remaining on property owned, leased, or occupied by that person;
(E)     Contacting that person by telephone;
(F)     Sending mail or electronic communications to that person; or
(G)     Placing an object on, or delivering an object to, property owned, leased, or occupied by that person[.]

Id. § 39-17-315(a)(5). "Emotional distress" is defined as "significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling[.]" Id. § 39-17-315(a)(2). Moreover,

In a prosecution for a violation of this section, evidence that the defendant continued to engage in a course of conduct involving repeated unconsented contact with the victim after having been requested by the victim to discontinue the conduct or a different form of unconsented contact, and to refrain from any further unconsented contact with the victim, is prima facie evidence that the continuation of the course of conduct caused the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

Id. § 39-17-315(f).

Therefore, in order to sustain the offense of misdemeanor stalking, the State must prove that a defendant engaged in two or more acts of unconsented contact that actually caused emotional distress to the victim and would also cause a reasonable person such distress.

-7-

In her first challenge to the sufficiency of the evidence, Flowers claims that she did not engage in a pattern of conduct because all of the acts in question "occurred within less than twenty-four hours" and were "connected by both time and purpose." We disagree. The evidence in this case firmly established that Flowers engaged in a course of conduct. She made signs the night of May 7, 2013. She then placed two signs at the victim's place of work and one sign at the victim's home that same night. She went to the victim's place of work on May 8, 2013, and waited for him to leave. She then followed the victim when he left work and only stopped following him when she saw the victim enter the police station. These acts certainly meet the definition of a course of conduct. Id. § 39-17-315(a)(1)("a pattern of conduct composed of a series of two (2) or more separate noncontinuous acts evidencing a continuity of purpose"). Moreover, Flowers's acts constituted a pattern, were two or more in number, and were clearly distinct. Finally, as we will explain, these acts had a continuity of purpose because they were committed in order to intimidate, threaten, or harass the victim after he declined to provide transportation for their daughter.

Second, Flowers asserts that the evidence was insufficient to establish that the victim suffered "emotional distress" because there was no evidence showing that her conduct caused the victim "significant mental suffering or distress." She claims that the only evidence presented regarding the victim's mental state was when the victim testified to the following:

> You know, I don't want my name defamed like that. You know, I wouldn't do my worst enemy like that. You know, this is something that, you know, you don't do nobody like this, or jeopardize a job and everything like that. You know, I wouldn't do that to nobody.

She claims that while this testimony showed that the victim was "upset, irritated, or even angered, it simply does not translate into 'significant mental suffering.'"

The evidence at trial established that Flowers's unconsented contact would cause a reasonable person to suffer emotional distress and actually caused the victim in this case to suffer emotional distress. "Emotional distress" is defined as "significant mental suffering or distress <u>that may, but does not necessarily, require</u> medical or other professional treatment or counseling[.]" Id. § 39-17-315(a)(2) (emphasis added). The fact that medical or professional treatment or counseling is not mandatory substantially reduces the level of mental suffering or distress required under the stalking statute. Here, the victim testified that after he was informed that Flowers had hung signs at his work calling him a "deadbeat," he drove to work early and took the signs down. The victim stated he did not want his name "defamed like that," that he would not treat his "worst

-8-

enemy" the way Flowers had treated him with her conduct, and that Flowers had jeopardized his job by hanging these signs at his work. Based on the evidence presented at trial, a rational trier of fact could have found that the victim suffered significant mental distress from the signs Flowers posted, particularly the signs she posted at his work, because they jeopardized his employment. Moreover, it is important to note that Flowers's conduct met each and every example of unconsented contact described in the stalking statute. In light of the non-exclusive nature of the emotional distress language in the definition of harassment as well as the deliberately broad definition of emotional distress itself, we conclude that the proof presented at trial was sufficient to meet the definitions of harassment and emotional distress in the stalking statute.

Third, Flowers contends that her conduct did not amount to harassment of the victim because the definition of harassment in the stalking statute "expressly exempts [constitutionally] protected speech, or conduct that serves a legitimate purpose." She asserts that while many individuals might disagree with the manner in which she tried to rectify the victim's lack of parental involvement, the signs were a form of speech protected by the United States and Tennessee Constitutions and did not constitute "harassment." Alternatively, she contends that "[f]ew more legitimate purposes exist than efforts by a child's mother to increase the father's involvement in the life of their child." Flowers further claims that when the signs are removed from the evidence, the legal insufficiency of the evidence is unquestionable.

The Free Speech Clause of the First Amendment to the United States Constitution, which is made applicable to the states by the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I. Likewise, the Tennessee Constitution states, "The free communication of thoughts and opinions, is one of the invaluable rights of man and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty." Tenn. Const. art. I, § 19. "'[T]he right of free speech is not absolute at all times and under all circumstances.'" Spence v. State of Washington, 418 U.S. 405, 417 (1974) (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 571 (1942)). Instead, "[t]he right of free speech, though precious, remains subject to reasonable accommodation to other valued interests." Id. It is well established that "speech or writing used as an integral part of conduct in violation of a valid criminal statute" is not protected by the First Amendment. Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949); see also United States v. Stevens, 559 U.S. 460, 468-69 (2010) (noting that the prevention and punishment of speech integral to criminal conduct has "never been thought to raise any Constitutional problem"); United States v. Barnett, 667 F.2d 835, 842 (9th Cir. 1982) ("The [F]irst [A]mendment does not provide a defense to a criminal charge simply because the actor uses words to carry out his illegal purpose."); United States v. Varani, 435 F.2d 758, 762 (6th Cir. 1970) ("[S]peech is not protected by the First Amendment when it is the very

vehicle of the crime itself." (citations omitted)). In other words, "it does not abridge the freedom of speech to make a course of conduct illegal, even though the conduct is in some respect carried out by means of expression." Smithfield Foods, Inc. v. United Food & Commer. Workers Int'l Union, 585 F. Supp. 2d 789, 803 (E.D. Va. 2008) (citing Cox v. Louisiana, 379 U.S. 559, 563 (1965); Giboney, 336 U.S. at 502). As relevant in this case, "[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993).

Although Flowers claims that her signs were constitutionally protected free speech, the proof at trial established that Flowers used the words on the signs to carry out the offense of stalking. We have already recognized that speech integral to criminal conduct does not enjoy constitutional protection. See Stevens, 559 U.S. at 468; Giboney, 336 U.S. at 498. Accordingly, we conclude Flowers's signs are not constitutionally protected speech and, therefore, are not exempted from the harassment definition in the stalking statute. In reaching this conclusion, we recognize that the stalking statute serves the legitimate goal of making conduct illegal before it escalates to violence. Although the facts in this particular case did not result in violence, one can easily envision a scenario in which Flowers's conduct could have resulted in physical injury or death to either Flowers or the victim. As we noted, "[t]he right of free speech, though precious, remains subject to reasonable accommodation to other valued interests." Spence, 418 U.S. at 417. In this case, Flowers does not enjoy constitutional protection for posting these signs because her right to free speech is subject to the valued interests of preventing the offense of stalking and deterring conduct that often escalates to violence.

We also conclude that Flowers's conduct is not exempted from the harassment definition of the stalking statute because it did not serve a legitimate purpose. The proof at trial showed that although Flowers claimed that she made and posted the signs and followed the victim after work for the legitimate purpose of having a conversation with the victim about his transportation of their daughter, Flowers admitted that she was angry with the victim and that she posted the signs to show other people that the victim was a "deadbeat" and to make the victim feel bad. Moreover, Priscilla Dawson testified that the signs were not so much for the purpose of Flowers and the victim having a meaningful conversation about their daughter's transportation but to send a message to the victim about what he had done wrong. We agree with the court that Flowers's conduct did not serve a legitimate purpose because she could not have reasonably expected for the victim to talk to her about transportation issues concerning their daughter after taking the aggressive steps of posting signs at his home and work calling him a "deadbeat" and following the victim as he left work. Because Flowers's conduct did not serve a legitimate purpose, it is not exempted under the definition of harassment in the stalking statute. Consequently, Flower's signs and her conduct can be considered in determining

-10-

the sufficiency of the evidence.

Fourth, Flowers asserts that the language of the statute, which defines stalking as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel . . . harassed . . . and that actually causes the victim to feel . . . harassed" is confusing and requires "much more serious conduct than unwanted prodding, nagging, bothering, irritating, or embarrassing." While we acknowledge that the aforementioned language of the statute is not a perfect example of clarity, we nevertheless conclude that it sufficiently identifies the elements of the stalking offense. Stalking is defined as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested[.]" T.C.A. § 39-17-315(a)(4). Flowers's conduct in making the signs, posting one sign at the victim's home, posting two signs at the victim's work, following the victim as he left work, and pulling beside the victim to get his attention as he left work certainly constituted "a willful course of conduct" and involved "repeated or continuing harassment." Moreover, we conclude that these acts would, at a minimum, cause a reasonable person to feel "intimidated, threatened, [or] harassed" and actually caused the victim in this case to feel "intimidated, threatened, [or] harassed." The evidence presented at trial established that after Flowers's attempts to procure the victim's cooperation in transporting their daughter proved unsuccessful, she resorted to posting the signs at his home to ruin his reputation in the community, posting signs at his place of employment to jeopardize his job, and following him after work to bully him. Flowers's intent in committing these acts was not to encourage a legitimate conversation with the victim about their daughter's transportation but to intimidate, threaten, or harass him because of his refusal to grant her request. We agree with the trial court that Flowers could have and should have pursued any issues regarding parenting responsibilities in a court of law, either pro se or with the assistance of an attorney, rather than resorting to the tactics she employed in this case. Nevertheless, her conduct meets all of the elements for the offense of stalking.

Fifth, Flowers asserts that she did not "intentionally engage" in stalking pursuant to Tennessee Code Annotated section 39-17-315(b)(1) because she did not, nor did she intend to, cause the victim significant mental suffering or distress and only intended to "spur the father of their 14 year old daughter . . . to be involved and help in the additional, non-monetary responsibilities of raising a child." We have already resolved the issue regarding emotional distress and have previously concluded that Flowers's conduct did not serve a legitimate purpose. "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result."

-11-

Id. § 39-11-302(a). Based on the facts presented at trial, we conclude that a rational trier of fact could have found that it was Flowers's conscious objective not only to engage in the conduct associated with the stalking charge but also to cause the result, which was to intimidate, threaten, or harass the victim in this case.

Finally, Flowers argues that while the facts in the recent case of State v. Jose A. Iniguez, No. W2009-01067-CCA-R3-CD, 2010 WL 4621890 (Tenn. Crim. App. Nov. 15, 2010), presented a clear case of stalking, the evidence in her case is insufficient to sustain her conviction for stalking. In Jose A. Iniguez, the defendant was convicted of misdemeanor stalking after he, over a period of three months, repeatedly appeared at the victim's work and stared at her, approached the victim several times and attempted to engage her in conversation even though the victim ignored him, endeavored to give the victim a gift and a card that she refused, continued to approach the victim after she informed him that she was married and told him to leave her alone, and deposited on the windshield of the victim's car a flower, gift, and card stating that he wanted to marry the victim and take her to Mexico. Id. at *6. We acknowledge that the facts in Flowers's case, which have First Amendment implications and involve a parental relationship between the parties, constitute a rather atypical stalking scenario. Nevertheless, we recognize, as discussed above, that the stalking statute was broadly drafted to include various types of conduct and to cover a variety of relationships between assailant and victim.[2]

---

[2] The stalking statute has been amended several times. Prior to its amendment in 2005, the statute criminalizing the offense of stalking provided:

> (a)(1) A person commits the offense of stalking who intentionally and repeatedly follows or harasses another person in such a manner as would cause that person to be in reasonable fear of being assaulted, suffering bodily injury or death.
>
> (2) As used in this section:
>
> (A) "Follows" means maintaining a visual or physical proximity over a period of time to a specific person in such a manner as would cause a reasonable person to have a fear of an assault, bodily injury or death;
>
> (B) "Harasses" means a course of conduct directed at a specific person which would cause a reasonable person to fear an assault, bodily injury, or death, including, but not limited to, verbal threats, written threats, vandalism, or unconsented-to physical contact; and
>
> (C) "Repeatedly" means on two (2) or more separate occasions.

T.C.A. § 39-17-315 (Supp. 2004). While the 2004 version of the stalking statute was limited to conduct that causes a person to be in reasonable fear of being assaulted, suffering bodily injury, or death, the current version of the statute includes conduct that "would cause a reasonable person to feel terrorized,

The evidence presented at trial showed that Flowers engaged in a willful course of conduct involving repeated or continuing harassment of the victim that would cause a reasonable person to feel intimidated, threatened, or harassed, and that actually caused the victim to feel intimidated, threatened, or harassed. Prior to May 8, 2013, Flowers sent several text messages to the victim calling the victim a "deadbeat dad," and the victim told Flowers to stop texting him." Flowers also telephoned the victim, and the victim hung up on her.[3] On May 7, 2013, Flowers placed signs calling the victim a "deadbeat" at the victim's home and at his place of employment, the Maury County Board of Education. After the victim was informed by another employee of the presence of at least one of these signs, the victim arrived at work early on May 8, 2013, and observed two signs, which stated, "Jason Dale is a deadbeat." He promptly removed these signs. There was a third sign posted at the victim's home that his neighbor threw in a ditch, which stated, "Jason Dale is a deadbeat dad, and he works for the Department of Education." When the victim left work on May 8, 2013, Flowers followed him and pulled beside the victim's car before the victim parked and entered the sheriff's department to file a report against Flowers. The victim testified that Flowers maligned him and jeopardized his employment by placing the aforementioned signs at his work and home. Flowers admitted at trial that she was angry at the victim on May 8, 2013, and that she had intentionally placed the signs so other people would view the victim as a "deadbeat" and so that the victim would feel bad. Dawson testified that Flowers posted the signs not so much for the purpose of encouraging a meaningful conversation with the victim about their daughter's transportation but to let others know what the victim had done wrong. As we previously held, Flowers's signs were not a constitutionally protected activity, and her conduct did not serve a legitimate purpose. Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found the essential elements of stalking beyond a reasonable doubt.

---

frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested[.]" Id. § 39-17-315 (Supp. 2012). In addition, while the 2004 version of the statute required the person to intentionally or repeatedly follow or harass the victim, the current statute provides several examples of unconsented contact with the victim but does not limit unconsented contact to these examples. Moreover, there is currently proposed legislation expanding the offense of aggravated stalking to include individuals who commit stalking against a victim who is at least sixty-five years of age when the individual committing the stalking is five or more years younger than the victim. See S.B. 369, 109th Gen. Ass., 1st Reg. Sess. (Tenn. 2015); H.B. 410, 109th Gen. Ass., 1st Reg. Sess. (Tenn. 2015).

[3] While the proof established that the victim told Flowers he did not want to receive any more text messages from her and hung up on her during their telephone conversation, the evidence did not show that the victim told Flowers not to have any other unconsented contact with him. Consequently, this proof is not prima facie evidence that Flowers's continuation of her course of conduct caused the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested. See T.C.A. § 39-17-315(f). Nevertheless, Flowers's text messages and her phone call to the victim should be considered in determining whether the elements of stalking are satisfied.

Accordingly, Flowers's conviction is affirmed.

## **CONCLUSION**

Based on the above authorities and reasoning, the judgment in this case is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE